[632 NYS2d 520]

HUBERT P. BECK et al., Appellants, v MANUFACTURERS HANOVER TRUST COMPANY, Respondent.

First Department, September 28, 1995

1

2

---

APPEARANCES OF COUNSEL

*Stuart Hecker* and *Peter J. Steckler* for appellants.

*Adlai S. Hardin, Jr.,* of counsel *(Susanne M. Toes* on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for respondent.

OPINION OF THE COURT

MURPHY, P. J.

Plaintiffs are holders of defaulted bearer bonds from two series of such instruments issued in 1902 by the National Railway Company of Mexico, a Utah corporation. The first series of bonds, referred to in this litigation as the "Debt 17 Bonds", was comprised of prior lien gold bonds due on October 1, 1926, and the second, referred to as the "Debt 18 Bonds", of consolidated mortgage bonds due on October 1, 1951. Although both issues are secured by the same collateral, the principal and interest on the Debt 17 Bonds must be paid before satisfaction of the outstanding obligation on the Debt 18 Bonds. It is undisputed that both series of bonds have been in default as to interest since 1914 and as to principal since their 1926 and 1951 due dates.

The defendant is the successor Trustee of the collateral securing payment of the bonds, acting as such pursuant to the terms of indentures executed at the time the bonds were issued.

The allegations of the complaint focus principally upon the defendant Trustee's conduct with respect to the disposition of certain collateral securing payment of the bonds. This collateral, referred to by plaintiffs as the "sold collateral" to distinguish it from collateral still remaining with the Trustee, was auctioned in Laredo, Texas, on November 2, 1982 to the auction's single bidder, a then recently incorporated entity by the name of Mexrail, Inc. Mexrail purchased the collateral for the upset price of $31 million. As payment, Mexrail tendered a check for $1,292,700, a certification from the Banco de Mexico attesting to Mexico's ownership of certain Debt 17 Bonds held by the bank as Mexico's bailee, and three assignments of those same Debt 17 Bonds pursuant to which title to the bonds was purportedly transferred from Mexico to Mexrail. Although acknowledging that if the assigned bonds were in fact still outstanding, their tender would have entitled the purchaser to a credit against the sale price in an amount equal to the ratable share the purchaser as a holder would otherwise have been due from the sale proceeds, plaintiffs contend that the bonds purportedly assigned Mexrail were not in fact outstanding and that the assignments offered as payment in lieu of the bonds themselves were for this and other reasons not valid tender for the purchase of the collateral. Plaintiffs thus claim that the Trustee, having accepted the tender without question, was in default of its contractual and fiduciary responsibilities and

is accountable for what is alleged to be a persisting unpaid purchase price balance of $29,707,300. Plaintiffs further allege numerous irregularities in the conduct of the auction—most notably in the setting of the upset price—and claim that the Trustee's tolerance of and indeed participation in these irregularities also constituted breaches of the fiduciary duty owed by the Trustee to plaintiffs as trust beneficiaries. By reason of these breaches, plaintiffs assert that they have been prevented from obtaining full payment of the aggregate principal and accrued but unpaid interest due on their Debt 17 and Debt 18 Bonds.

The facts relevant to these generally stated claims are complex. Following issuance of the bonds in 1902, control of the issuer, the National Railway Company of Mexico, was in 1908 transferred to Ferrocarriles Nacionales de Mexico, an entity in which the Mexican Government possessed a controlling interest. Incident to this transfer, Ferrocarriles took over the operations of the Utah corporation, acquired all its assets and undertook to satisfy its obligations, including of course those evidenced by the Debt 17 and 18 Bonds. As noted, however, in 1914 Ferrocarriles suspended interest payments on the bonds.

In 1937, while the bonds remained in default, the Mexican Government expropriated all of the Mexican assets of Ferrocarriles and vested control over those assets in a national railway bureau operating "under the direct dependency of the Federal Executive".

In 1946, Mexico, intent upon reducing and restructuring its debt generally, and in particular that part of the Mexican debt represented by the outstanding obligations of Ferrocarriles, entered into an agreement with a self-constituted International Committee of Bankers on Mexico. As is here relevant, the Agreement provided that "assenting" Debt 17 and 18 bondholders could surrender their bonds to Mexico in exchange for payments of principal and interest, albeit reduced from the amounts of principal and interest actually owing under the original terms of the indebtedness. Plaintiffs, who never assented to the terms of the 1946 Agreement and accordingly never surrendered their bonds, and who are in the parlance of the Agreement "non-assenting" bondholders, stress that the Agreement described the bonds which were tendered by "assenting" holders as "redeemed" or "retired" and note that although "redeemed" and "retired" the surrendered bonds continued to be treated as valid and outstanding by the

Trustee; Mexico as holder of the surrendered bonds was permitted to participate in numerous interim distributions by the Trustee of accrued but unpaid interest on the bonds and, of course, the Trustee treated Mexico as a holder in connection with all matters relevant to the presently disputed November 1982 sale of the collateral.

By the early 1980's, Mexico had, by means of surrenders made pursuant to the 1946 Agreement, amassed bonds together representing 95.83% of the original Debt 17 obligation and 95.50% of the original Debt 18 obligation. Of course, Mexico's purchases under the 1946 Agreement were made not simply to reduce the outstanding obligation but eventually to facilitate Mexico's purchase of the collateral. This latter objective was fully disclosed in the 1946 Agreement and in the prospectus filed by Mexico with the Securities and Exchange Commission (SEC) in connection with Mexico's public offer to purchase the bonds. Article IX of the 1946 Agreement, entitled "Application of * * * Property Held by Trustees * * * Under Indentures", provided that an assenting bondholder surrendering his or her bonds pursuant to the Agreement would release "any interest he may have in any [collateral held by] any of the trustees [for the Bonds] * * * and consents that his allocable share of such [collateral] be paid and turned over to the Fiscal Agent and further directs that the Trustee or Trustees of his issue or issues pay to and turn over his said allocable share to the Fiscal Agent." And, upon Mexico's performance of its obligations under the Agreement, Article IX further provided that the Fiscal Agent was directed "[to] deliver such funds or other property to the [Mexican] government, without any accountability for interest thereon." Similarly, Mexico's SEC prospectus stated that in the event of a distribution of the collateral, "[t]he balance of the funds in the hands of The Hanover Bank [the Trustee] will be paid over to the American Trust Company as Fiscal Agent of the Mexican Government under the assignments made by assenting Railways bondholders".

Negotiations directed at facilitating Mexico's long anticipated acquisition of the collateral apparently began between the Mexican Government, as represented by the law firm of Milbank, Tweed, Hadley & McCloy, and the Trustee, as represented by the law firm of Kelley, Dreye & Warren, during the 1970's. It is undisputed that these negotiations were conducted exclusively between the Trustee and one trust beneficiary, namely Mexico, and that the other trust beneficiaries, including plaintiffs, were not invited to and accordingly did not par-

ticipate. The privacy of these negotiations was purportedly authorized by Article Four, Section 5 of the Indenture which provided that holders of 75% of the amount of the prior lien bonds outstanding were entitled "to direct and to control the method and place of conducting any and all proceedings for any sale of the premises hereby conveyed [i.e., the collateral]"; as noted, Mexico had by the time of the aforementioned negotiations acquired bonds representing considerably more than 75% of the value of the prior lien issue. In any case, it is clear that the parties to these negotiations concluded that a portion of the collateral should be auctioned and, apparently, that much of the preparation for the auction, including the evaluation of the collateral to be sold, should be conducted at the behest and under the supervision of parties other than the Trustee.

The collateral sold at the Laredo auction consisted of (1) all of the authorized and outstanding shares of $100 par value capital stock of the Texas-Mexican Railway (otherwise referred to as "Tex-Mex"); (2) real estate either owned by Tex-Mex or leased to Tex-Mex by the National Railway Company of Mexico; (3) Tex-Mex 6% bonds together evidencing a principal indebtedness of $1,380,000; (4) 7% bonds issued by the Corpus Christie, San Diego & Rio Grande Narrow Gauge Railway Company (the corporate predecessor of Tex-Mex) in the aggregate principal amount of $960,000; and (5) that part of the International Railroad Bridge running between Laredo, Texas, and Nuevo Laredo, Mexico, situated in the United States. Three valuations were utilized in determining the upset price for the auction. Two of these were apparently rendered at the request of Mr. Andres Ramos, president of Tex-Mex, and respectively bore upon the Laredo real estate leased by Tex-Mex from National and the nonoperating properties of Tex-Mex. The assessor, a Laredo real estate appraiser, valued the former at $3,475,000 and the latter at $2,245,000. The third valuation was of Tex-Mex itself and was performed by the firm of Lehman Brothers, Kuhn and Loeb (LBKL) at the behest of Mexico. Indeed, prominently emblazoned on the cover sheet of the LBKL valuation was the inscription, *"Confidential:* Prepared solely for the use of the Government of Mexico and its Agencies". And, on the valuation's second page appeared the following disclaimer: "This is a confidential memorandum prepared solely for the use of the Government of Mexico and its Agencies. This memorandum has been prepared by Lehman Brothers Kuhn Loeb Incorporated ('LBKL') primarily from information received from The Texas Mexican Railway Company,

and no independent verification of this material has been made by LBKL. LBKL makes no representations or warranties, expressed or implied, as to the accuracy or completeness of this confidential memorandum or any of its contents, and no legal liability is assumed or to be implied with respect thereto."

LBKL assigned Tex-Mex an initial worth of between $19,800,000 and $23,100,000 and to that worth added $7,200,000 representing the extent of Tex-Mex's liquidity in excess of that needed to meet its operating expenses. Also added to the initial assessed value was $2,200,000 representing the worth of the Tex-Mex nonoperating real estate as determined in the aforementioned assessment rendered at the request of Tex-Mex president, Andres Ramos. LBKL thus concluded that Tex-Mex's total value lay somewhere between $29,200,000 and $32,500,000, and it was upon this conclusion that the Trustee evidently relied when it set the upset price for the auction at $31,000,000. The record is devoid of any indication that the LBKL valuation, which was solicited by a trust beneficiary—indeed, by the very beneficiary whom the Trustee must have understood would either in its own name or that of a nominee eventually purchase the valued property—and which was performed in exclusive and avowedly uncritical reliance upon information furnished by the valued entity, was the subject of any independent review by the Trustee.

On November 2, 1982, the date of the Laredo auction, Mexico assigned its Debt 17 Bonds together representing 95.83% of the prior lien debt to Transportacion Maritima Mexicana, S.A., a Mexican transportation conglomerate, which in turn assigned the bonds to its newly incorporated subsidiary, Mexrail. Mexrail then assigned the bonds to the Trustee as payment of 95.83% of the $31,000,000 purchase price. As could hardly have come as a surprise given its acquisition of so large a portion of the purportedly outstanding Debt 17 Bonds, Mexrail was, as noted, the only bidder at the auction and, accordingly, was able to purchase the sold collateral for the upset price.

Plaintiffs' complaint dated March 28, 1983 contains five causes of action. The first alleges that defendant was obligated under the 1946 Agreement to treat the bonds purchased by Mexico under that Agreement as having been cancelled and that if this had been done the auction sale proceeds of $31,000,000 would have been more than adequate to satisfy the entire principal and aggregate accrued but unpaid interest owing on plaintiffs' Debt 17 and 18 Bonds which, according to the complaint, amounted to approximately $2.5 million. The second

cause alleges that even if defendant was not obligated under the 1946 Agreement to treat the bonds purchased thereunder as having been cancelled, it nevertheless breached its fiduciary responsibility to nonassenting bondholders such as plaintiffs when it accorded Mexico, by reason of its purchases pursuant to the 1946 Agreement, the status of a holder. The third cause alleges numerous irregularities in the preparations for the November 1982 auction and in the closing and aftermath of the sale. These include the above-described private negotiations between Mexico and the Trustee; the Trustee's failure to obtain independent valuations of the collateral; the Trustee's tolerance of technical defects in the assignments pursuant to which Mexrail purported at the auction to assert the rights of a holder; and the Trustee's failure to obtain the allegedly necessary certification that the transfer of the Tex-Mex assets was being accomplished in accordance with Mexican law. All of the foregoing were alleged to constitute breaches of the Trustee's fiduciary obligations to plaintiffs, and in the fourth cause of action were additionally alleged, along with the derelictions cited in the first and second causes of action, to constitute instances in which the Trustee had performed its fiduciary responsibilities in a grossly negligent and reckless manner. Finally, the fifth cause of action, incorporating by reference all of the previously alleged failures of the Trustee, claimed that plaintiffs had been damaged by the Trustee's negligence. As to each cause, plaintiffs sought actual damages of $2.5 million and in all but the fifth cause punitive damages ranging from $25 million (first and second causes) to $500 million (third cause).

On a previously litigated summary judgment motion, defendant sought dismissal of the complaint upon the ground that plaintiffs had no standing to bring the action since they were not holders, their status as such allegedly having terminated by reason of their failure to register their bonds in accordance with Mexican law; pursuant to Mexico's 1951 "Law on the Fate of Enemy Bonds", title to designated bonds, including those here at issue, was deemed vested in the Mexican Government if the bonds had not been registered under the Mexican World War II registration decrees to demonstrate nonenemy ownership. In denying the motion, the court held that notwithstanding Ferrocarriles' 1908 takeover of the National Railway Company of Mexico (the Utah corporation) and the subsequent expropriation by Mexico of Ferrocarriles' Mexican assets, National remained the issuer of the subject bonds and the primary obligor thereunder and, accordingly, that since the site of the obligation evidenced by the bonds remained in the

United States rather than Mexico "[t]he Mexican agreements and decrees neither had, nor could have had, any legal effect on National and the holders of its obligations." The order premised on this determination was affirmed by this Court in May 1985 (111 AD2d 601).

After a hiatus of some six years during which the litigation for long periods lay dormant, plaintiffs between October 1991 and July 1992 filed five of the six motions here at issue. Three of these motions were for summary judgment; they sought to establish the plaintiffs' right to compensatory damages on various theories, not all of which were asserted in the complaint. The remaining two motions respectively sought to compel the Trustee to account for its disposition of the trust assets both before and after the November 1982 sale of the collateral and to obtain further discovery from four attorneys pertinent principally to the allegations contained in the complaint's third cause of action. The need for further disclosure, plaintiffs claimed, arose by reason of inappropriate assertions of attorney-client privilege by those attorneys.

In March 1992, two of plaintiffs' summary judgment motions as well as their motions for an accounting and additional discovery were denied. The motion court noted simply that plaintiffs had not adduced evidence warranting judgment as a matter of law and that the sought accounting did not appear related to the issues framed by the complaint. In support of its denial of additional discovery, the court observed that a note of issue had been filed, that there were no discovery demands outstanding and that plaintiffs had failed to specify any area in which additional discovery was warranted.

In September 1992, defendant moved for summary judgment, urging that it had in all relevant respects acted in accordance with the terms of the trust indentures and by so doing had completely fulfilled its obligations to the trust beneficiaries. This motion was consolidated with plaintiffs' third motion for summary judgment, which had been pending since July 1992, and the consolidated motions were decided in November 1992. The court denied plaintiffs' motion, but granted defendant's and thereupon dismissed the complaint. In support of this disposition the court stated in relevant part, "the defendant trustee by citing the trust indentures' requirement that Mexico be treated as holder of the bonds it purchased, satisfied its burden of producing evidence which, if uncontroverted, is sufficient to warrant judgment in its favor as a matter of law. On the other hand, the plaintiffs have not met their burden of

demonstrating the existence of any material triable issue of fact."

Although plaintiffs have appealed from both the March and November determinations of the motion court, it is well to consider the propriety of the latter ruling first, for if the defendant's motion for summary judgment dismissing the complaint was properly granted, it would follow that plaintiffs' motions for summary judgment were without merit and that plaintiffs' requests for an accounting and additional discovery have at the very least become moot.

■ If the single relevant inquiry in this case were whether the Trustee had acted in accordance with the terms of the trust indentures, we would be inclined to agree with the motion court as to the complaint's dismissal. However, because we are of the view that the Trustee of the collateral securing payment of the defaulted bonds here at issue had fiduciary responsibilities to the trust beneficiaries and that those responsibilities were in some respects broader than the obligations specified in the indentures, we cannot agree that the relevant inquiry was exhausted simply by measuring the Trustee's performance against the requirements of the indentures. Necessary to a proper dismissal of the within complaint was the further determination that the Trustee had, with respect to the matters raised in the complaint, treated plaintiff trust beneficiaries in a manner consistent with the Trustees obligations as their fiduciary, or, at least, that if there had been some default in the Trustee's performance as a fiduciary it had not harmed plaintiffs. As that further determination cannot in our view be made as a matter of law on the present record, we modify the appealed November 1992 order to reinstate those portions of the third and fourth causes of action alleging that the Trustee's failure to obtain a competent, independent valuation of the sold collateral constituted a breach of the fiduciary duty owed by the Trustee to the trust beneficiaries; this breach is alleged to have resulted in the undervaluation of the auctioned trust assets, a circumstance from which consequential economic harm to the plaintiff trust beneficiaries may be readily perceived.

Although defendant maintains, in reliance upon the 1936 decision of Judge Rosenman in *Hazzard v Chase Natl. Bank* (159 Misc 57, *affd* 257 App Div 950, *affd* 282 NY 652, *cert denied* 311 US 708), that the duties of an indenture trustee are strictly defined and limited by the terms of the trust indenture (159 Misc, *supra,* at 60, 79), this rule adhered to reluctantly in *Haz-*

*zard*—a decision in which the court decried and called for legislative action to remedy what it termed the "injustice" of "modern indentures" *(supra,* at 83), such instruments having by then become overladen with exculpatory provisions effectively insulating corporate indenture "trustees" from legal accountability for what would reasonably be viewed as serious lapses in their performance—has since been tempered both by decisional law and statute. Thus, it has more recently been held that fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries. Indeed, in *United States Trust Co. v First Natl. City Bank* (57 AD2d 285, *affd* 45 NY2d 869), a case in which the defendant maintained, as does the present defendant, that "its duties as trustee were circumscribed by the indenture, that they were purely contractual duties, and that the defendant was not really a trustee within the rules imposing fiduciary liability on trustees" *(supra,* at 295-296), Justice Silverman of this Court had occasion to observe: "This precise contention was made and rejected in *Dabney v Chase Nat. Bank* (196 F2d 668). There the court had before it an indenture executed before the Trust Indenture Act and governed by the pre-existing law of New York. The court held in an opinion by Judge LEARNED HAND that notwithstanding very narrow definitions of the trustee's duties in the indenture, the trustee was still liable for breach of its fiduciary obligation of loyalty. In his opinion, Judge HAND said (p 670): '[T]he duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee. It is a part of his obligation to give his beneficiary his undivided loyalty, free from any conflicting personal interest; an obligation that has been nowhere more jealously and rigidly enforced than in New York where these indentures were executed.' Speaking of some language in *Hazzard v Chase Nat. Bank* (159 Misc 57, 84, affd 257 App Div 950, affd 282 NY 652), that seemed to suggest that an indenture trustee's rights and duties were defined not by the fiduciary relationship but exclusively by the terms of the agreement, Judge HAND said (p 671): 'That language we read only as criticism of practices that had grown up, and not as asserting that the courts of New York had given any countenance to the notion that, so far as a corporation sees fit to assume the duties of an indenture trustee, it can shake off the loyalty demanded of every trustee, corporate or individual. We can find no warrant for so supposing; and, indeed, a trust for

the benefit of a numerous and changing body of bondholders appears to us to be preeminently an occasion for a scruple even greater than ordinary; for such beneficiaries often have too small a stake to follow the fate of their investment and protect their rights.' "

It would thus appear indisputable that the rule of *Hazzard* notwithstanding, the present defendant owed the trust beneficiaries, including plaintiffs, the fiduciary obligation of undivided loyalty. But it was not loyalty alone among the constellation of fiduciary attributes that was required of the present Trustee, for even if the responsibilities of an indenture trustee may be significantly more narrowly defined than those of an ordinary trustee while the obligation that it is the indenture's purpose to secure remains current, subsequent to the obligor's default, as herein, it is clear that the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture. The reality militating in favor of this revised allocation of responsibility, of course, is that in the aftermath of a default by the obligor, bondholders, particularly those whose bonds represent only a relatively small portion of a large issue, will, as a practical matter, be unable to act effectively to guard against the further impairment of their economic interests, and although those interests may be relatively small when compared to the entire issue, they may nevertheless be, and often are, extremely substantial in the context of the individual bondholder's assets. Subsequent to default, it is usually only the trustee who is able to act swiftly and effectively to assure, insofar as assurance can be had, that the rights of bondholders to recover what they are owed will ultimately be vindicated. It simply does not accord with sound public policy or the ostensible purposes for which an indenture is made and relied upon by its beneficiaries, to allow indenture trustees the benefit of broad exculpatory provisions to excuse their failure to exercise those powers they possess pursuant to the indenture prudently in order to mitigate or obviate the consequences of default. The fundamental and highly salutary purpose of a bond indenture is to secure payment of the underlying obligation. If, however, an indenture trustee is under no enforceable obligation to act prudently to preserve and manage the trust assets in the event of default, and so to provide some reasonable assurance that the bondholders eventually receive their due, it may be asked whether the indenture does in fact secure the payment of anything. It was, no doubt, in light of the obvious injustice and futility counte-

nanced by strict adherence to the common-law rule followed so reluctantly in *Hazzard (supra)* that the Legislature almost 60 years ago enacted Real Property Law § 126 requiring indenture trustees appointed in connection with "mortgage investments" *(see,* Real Property Law §§ 124, 125), "[i]n the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." (§ 126 [1].) There is no good reason why the common law should not impose a like requirement upon indenture trustees in the event of default, especially in an era when the antiquated and much abused common-law rule requiring strict adherence to the indenture terms has been so widely supplanted by remedial legislation such as Real Property Law § 126. Having said this, it is important to stress that this by-now relatively minor change in the legal landscape, if change it is, does not render the indenture irrelevant. The trustee must in the postdefault context act prudently, but only in the exercise of those rights and powers granted in the indenture. The scope of the trustee's obligation then is still circumscribed by the indenture, albeit less narrowly. The trustee is not required to act beyond his contractually conferred rights and powers, but must, as prudence dictates, exercise those singularly conferred preroga-tives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation.

To hold an indenture trustee to a fiduciary duty of undivided loyalty and to impose a postdefault obligation of prudence in the exercise of the rights and powers accorded by the indenture, of course, only constitutes the embrace of certain standards, it does not in any way signify that those standards have not been met. And, indeed, with one notable exception it would appear that the various claims of fiduciary inadequacy made against the present Trustee are without merit.

The complaint's first and second causes of action allege that the Trustee either breached its fiduciary duty or violated pro-visions of the indenture when it in various contexts treated Mexico as a holder of Debt 17 and Debt 18 Bonds. None of these "holder" claims possess merit and their dismissal by the motion court was accordingly correct.

Contrary to the allegations in plaintiffs' first cause, the Trustee was not obligated to enforce the above-described 1946 Agreement for the benefit of the "non-assenting" bondholders

such as plaintiffs. There is no reading of the 1946 Agreement that would support plaintiffs' contention that they were third-party beneficiaries thereunder. Indeed, far from contemplating any benefit to third parties, the Agreement quite clearly limits the benefits accorded thereunder to those assenting to its terms. Defendant, which was not a party to the 1946 Agreement, obviously had neither duty nor, for that matter, standing to enforce the Agreement for anyone's benefit, much less third parties such as plaintiffs who had steadfastly refused to assent to the Agreement's terms. Nor, even if the Agreement had been enforceable by the Trustee, does it follow that its enforcement would have, as the plaintiffs claim, required cancellation of bonds purchased thereunder. It is plain from the Agreement itself and the aforecited SEC prospectus that the Agreement, although employing the terms "retirement" and "redemption", did not contemplate the bonds' cancellation. To the contrary, as was fully disclosed, the Agreement contemplated the eventual use of the bonds by Mexico for the purchase of the collateral.

Under the second cause of action two additional "holder" claims are presented: it is contended that the bond purchases made by Mexico required their cancellation or "extinguishment" pursuant to the trust indenture, and that the Trustee was obligated under common-law principles to treat the Mexican purchases pursuant to the 1946 Agreement as extinguishments of debt rather than simple purchases. However, cancellation of the bonds would only have been required pursuant to the indenture if the bonds had been purchased by their issuer pursuant to Article X of the indenture; but the bond purchases here at issue, made pursuant to the 1946 Agreement, do not qualify as Article X purchases. This is because even if, as plaintiffs allege, Mexico was an obligor on the bonds, either by reason of its controlling interest in Ferrocarriles or its subsequent expropriation of Ferrocarriles' assets, it was not the "issuer"; as was previously determined in this litigation (see, supra, at 8-9), the Utah corporation remains the primary obligor and "issuer" as that term is employed in the indenture.

Respecting the claim that the Trustee was obligated under relevant common-law principles to treat the Mexican bond acquisitions as "extinguishments" rather than purchases, as the plaintiffs concede and as the cited cases vividly demonstrate, the distinction is often far from clear and ultimately hinges on the unique facts of each case. Even if this were a

case in which a court might ultimately rule that the Mexican acquisitions pursuant to the 1946 Agreement were in the nature of "extinguishments", the initial issue before us is not the correct judicial outcome, but whether the judgment involved is of a sort that an indenture trustee in its limited fiduciary capacity ought to be held accountable for making. The unfairness of requiring an indenture trustee to exercise judgment, let alone correct judgment, in matters most frequently highly ambiguous even with the benefit of close and time-intensive judicial scrutiny, would seem to us manifest. But even if the common-law distinction between a purchase and an extinguishment was one the Trustee was bound to make, it is clear that the Trustee would have, in this exceptionally clear-cut case, been correct in deeming the acquisitions pursuant to the 1946 Agreement simple purchases. Given the aforecited provisions of the Agreement and the SEC prospectus, it was absolutely plain that the parties to the Agreement had no expectation that the bonds surrendered under the Agreement would be "extinguished". And, as it is the parties' intent which determines how the transaction is ultimately characterized (*see, Wood v Guarantee Trust Co.,* 128 US 416, 424; *Baer v Security Trust Co.,* 32 F2d 147, 150, *cert denied* 280 US 588), there would appear to be no basis for viewing the Mexican bond acquisitions as anything but simple purchases. From the foregoing it would appear that the second cause of action was properly dismissed.

The third cause of action, as noted, contains numerous allegations relating to the preparations for the Laredo auction. To the extent that these allegations bear upon the Trustee's compliance with technical indenture requirements incident to the assignments by which title to the Mexican bonds ultimately was transferred to Mexrail, it is impossible to perceive how, even if the allegations were proved, the plaintiffs suffered any consequent injury. While plaintiffs ask us to suppose that if the Trustee had acted to invalidate the assignments to Mexrail and Mexrail had thus been eliminated as a highly leveraged bidder, a "spirited" auction would have resulted and that the bidding, now occurring upon a "level playing field", would have culminated in a sale price more in accord with the true value of the collateral, this is sheer speculation. Indeed, there is no evidence in this now well-developed record indicating that there were any bidders other than Mexico or its nominee prepared to purchase the collateral at or near its upset price. Moreover, even if the assignments to Mexrail had been invalidated, Mexico itself might still have tendered the nonassenting

bonds as payment for the collateral and the "playing field" would still have been hopelessly lopsided. In any case, plaintiffs' unbridled speculation as to the consequences stemming from the Trustee's allowance of the assignments to Mexrail is not sufficient to sustain the cited allegations as a basis for recovery.

As to the allegations pertinent to the Trustee's role in determining the upset price for the Laredo auction, however, we reach a decidedly different conclusion. Indeed, it is precisely because all concerned doubtless understood that the auction of the collateral would not be an occasion for "spirited bidding" that the Trustee's evaluation of the collateral for the purpose of setting the upset price was absolutely critical. Here, Mexico, which for decades had had designs upon obtaining the collateral and, avowedly for that purpose, systematically purchased in excess of 95% of the bonds, had called for an auction in order finally to make the long contemplated acquisition. It could not have been clearer that either Mexico or some other entity acting as its nominee would appear at the auction, make a highly leveraged bid, and ultimately purchase the collateral paying only a small portion of the price in cash. While denominated an "auction", this was in its true aspect nothing but a sale to a preordained buyer. In this context, it was plain that the collateral would be purchased, if at all, at the upset price established by the Trustee. Given this state of affairs, it was absolutely crucial to the interests of the trust beneficiaries as beneficiaries, as opposed to the interests of Mexico as a beneficiary/prospective purchaser, that the collateral be fairly valued by a disinterested party. Mexico, of course, was interested in purchasing the collateral for as little as possible, yet it was not to Mexico as purchaser-apparent that the Trustee owed its duty of loyalty, but to all the trust beneficiaries uniformly as obligees. It was not consistent with its duty of undivided loyalty to the obligees as obligees for the Trustee in setting the upset price to have relied, so far as can be ascertained from the record, exclusively upon evaluations solicited by either the valued entities or by Mexico, the purchaser-apparent. Nor was it consistent for the Trustee to have relied upon evaluations in which all the relevant data was provided by the valued entities and there was no independent verification of the information relied upon. The LBKL evaluation in particular, which appears to have been the appraisal most heavily relied upon by the Trustee, was, according to the disclaimers on its front pages, not for anyone's use but that of Mexico, the likely purchaser, and its data was assertedly not

verified in any respect. If, as is evidently the case, the Trustee did in fact rely upon this document for the purpose of setting the upset, and for all intents and purposes, final sale price for collateral securing obligations in default for close to 70 years, it constituted a clear breach of the Trustee's fiduciary obligations to the trust beneficiaries and a decidedly imprudent exercise of the powers which the Trustee certainly possessed to insure the fairness of the "auction". While it is on the present record uncertain if there was such a breach and, if there was, what, if any, damages the plaintiffs suffered as a result, the record does contain considerable uncontradicted, albeit inconclusive, evidence of the alleged breach and of the collateral's undervaluation. At the very least, then, the record raises substantial factual issues that should have precluded dismissal of the complaint. While this litigation has been protracted and on occasion unnecessarily vexatious, it is nevertheless the case that, although virtually buried under plaintiffs' all too numerous meritless and sometimes trivial claims and motions, there is to be found in the complaint and accompanying record, a substantial equitable claim which, in our view, is deserving of a full hearing.

Finally, we agree in all other respects with the motion court's dispositions. The accounting sought simply does not relate to the allegations of the complaint. Moreover, there is no real issue as to the disposition of the auction proceeds. Nor are there substantial allegations of Trustee misconduct subsequent to the auction which would warrant an accounting.

Concerning the motion for further discovery, as noted by the motion court, a note of issue has long since been filed, after the conduct of extensive discovery and at a time when there were no discovery demands outstanding. Under the circumstances, a trial of this matter should not be delayed further. Moreover, to the extent that plaintiffs seek access to communications and documents concededly falling within the protective ambit of the attorney-client privilege, their disclosure request is without merit. While plaintiffs as trust beneficiaries seek access to the materials under the exception to the privilege articulated in *Hoopes v Carota* (142 AD2d 906, *affd* 74 NY2d 716), that exception is not applicable here. As the record shows, plaintiffs have been in an adversary relation with the Trustee since the late 1970's and the disclosure plaintiffs apparently seek concerns communications not generally relevant to the administration of the trust, but specifically relevant to the handling of the very issues the plaintiffs had been threaten-

ing to litigate. It is precisely where, as here, the trustee consults counsel in order to defend itself against the conflicting claims of beneficiaries that the exception delineated in *Hoopes* is inapplicable *(Hoopes v Carota,* 142 AD2d, *supra,* at 910-911).

Accordingly, the order of the Supreme Court, New York County (Walter Schackman, J.), entered November 25, 1992, granting the defendant's motion for summary judgment dismissing the complaint, should be modified, on the law, to reinstate those portions of the third and fourth causes of action relevant to the Trustee's conduct with regard to setting the upset price for the Laredo auction and, except as so modified, the order should be affirmed; and the order of the same court and Justice, entered March 18, 1992, denying plaintiffs' motions, respectively, for summary judgment, an accounting and further discovery, should be affirmed, both without costs.

SULLIVAN and ROSENBERGER, JJ., concur with MURPHY, P. J.; KUPFERMAN, J., dissents and would affirm the order of November 25, 1992, for the reasons stated by Schackman, J.

Order, Supreme Court, New York County, entered November 25, 1992, modified, on the law, to reinstate those portions of the third and fourth causes of action relevant to the Trustee's conduct with regard to setting the upset price for the Laredo auction and, except as so modified, affirmed; and order, same court and Justice, entered March 18, 1992, affirmed, both without costs.