[18 NYS3d 1]

NAMA Holdings, LLC, etc., Respondent, v Greenberg Traurig LLP et al., Appellants, et al., Defendant.

First Department, October 8, 2015

### APPEARANCES OF COUNSEL

*Steptoe & Johnson LLP*, New York City (*Justin Y.K. Chu* of counsel), for Greenberg Traurig LLP and another, appellants.

*Dorsey & Whitney LLP*, New York City (*Jonathan Montcalm* and *David C. Singer* of counsel), for Shawn Samson and another, appellants.

*Berger & Webb LLP*, New York City (*Johnathan Rogin* and *Steven A. Berger* of counsel), for respondent.

### OPINION OF THE COURT

ACOSTA, J.

This appeal arises from a discovery dispute in which the managers of a limited liability company and corporate counsel invoke the attorney-client privilege in opposition to document requests by one of the company's investors. The investor argues that it is entitled to the so-called fiduciary exception to the privilege because it is a beneficiary of the attorney-client relationship that exists between the company's managers and counsel. The managers and counsel, on the other hand, contend that because the investor had interests that were adverse to the company's interests, the fiduciary exception is inapplicable. Supreme Court found that the parties were not adverse, and

ordered the production of all the documents claimed to be privileged (2014 NY Slip Op 32304[U] [2014]).

We conclude that "adversity" is not a threshold issue in determining whether the fiduciary exception is applicable in a given case, but one of several factors to consider in making that determination, and that adversity cannot be determined without a review of the purportedly privileged communications. Therefore, we remand the matter for an in camera review of the withheld documents and a full analysis of whether the exception is applicable in this case. Absent a more deliberate review and analysis, the risk of disclosure of privileged communications is manifest.

I. Facts and Background

The Alliance Network, LLC (Alliance), is an entity that was created to build and develop commercial properties in Las Vegas, Nevada. The properties were slated to become the world's largest showroom facility, known as the World Market Center (the WMC project).

Plaintiff, NAMA Holdings, LLC, is the majority investor in Alliance. Defendants Jack Kashani and Shawn Samson are Alliance's managers (the managers), and defendants Greenberg Traurig LLP and Robert Ivanhoe, the chair of Greenberg's global real estate practice, are Alliance's counsel (collectively, the attorneys).

Beginning in or about 2003, disputes arose between NAMA, the managers, and other members of Alliance concerning, inter alia, NAMA's purported refusal to provide funding for the WMC project in response to allegedly improper capital calls, and NAMA's complaints that the managers failed to provide it with certain information as required by Alliance's operating agreement. Alliance retained the attorneys as the company's counsel in 2003. In April 2004, NAMA, the managers, and other entities entered into a settlement agreement, which temporarily resolved their disputes. Related litigation and arbitration took place in Delaware and California before NAMA finally commenced the instant action, asserting direct and derivative claims against the above-named defendants for breach of fiduciary duty and aiding and abetting such a breach, tortious interference with prospective economic advantage, legal

malpractice, unjust enrichment, breach of contract, and conversion, and seeking declaratory and injunctive relief.[1]

In response to NAMA's document requests, the attorneys produced a privilege log containing more than 3,000 entries, and objected to NAMA's subsequent requests seeking documents related to the 2011 transfer of Alliance's entire interest in the WMC project to a newly formed entity known as International Market Centers LP (the IMC transfer).

NAMA moved to compel the production of all documents identified in the privilege log and all documents responsive to NAMA's requests regarding the IMC transfer, arguing that neither the attorney-client privilege nor the work-product privilege justified defendants' withholding of the documents. NAMA asserted that, in light of a California arbitral finding that "subsequent to the formation of [World Market Center Venture, LLC, an entity created by the 2004 settlement agreement], [the managers] largely abdicated their contractual duties to act on behalf of Alliance," NAMA was the only party safeguarding Alliance's interests. In addition, NAMA argued that the "fiduciary exception" to the attorney-client privilege compelled production, because the managers owed a fiduciary duty to NAMA and accordingly sought legal advice on its behalf. NAMA also argued that the crime-fraud exception to the attorney-client privilege warranted disclosure, because defendants were acting in furtherance of various intentional torts and possible crimes.

---

1. Specifically, NAMA alleges in its second amended complaint that the attorneys breached fiduciary duties to Alliance and NAMA, as well as aided and abetted the managers' breach of fiduciary duty by, among other things, advising and counseling the managers with respect to their interference with NAMA's rights and the rights and benefits of the various Alliance companies under certain agreements. NAMA further alleges that the managers engaged in self-dealing, with the assistance of the attorneys, by creating a secret partnership known as the Blue Diamond Venture (BDV), an entity that directly competes with the WMC project and in which the attorneys improperly took a financial interest. NAMA claims that BDV wrongfully appropriated Alliance's intellectual property, usurped business opportunities belonging to Alliance, and violated an operating agreement governing the management of Alliance. The second amended complaint further alleges that the attorneys actively assisted the managers in their efforts to improperly burden the assets of the WMC project, convert for their own benefit the assets and funds of the Alliance companies, divest NAMA of its interest in Alliance or the WMC project, and burden the Alliance companies with imprudent debt and improper calls for capital investment to the detriment of NAMA and the Alliance companies.

The motion court, in an order entered on April 30, 2013 (the 2013 order), determined that defendants had met their burden of establishing that some of the withheld documents might be privileged, and referred the matter to a special referee for an "item-by-item" review (2013 NY Slip Op 33981[U], *11 [2013]).

The court found that NAMA had established good cause for applying the fiduciary exception to the attorney-client privilege, noting that the communications as to which defendants asserted the privilege were made between the managers and counsel at a time when the managers had "abdicated" their duties to Alliance and the WMC project (after WMCV was created in April 2004). "[P]ursuant to the fiduciary exception," the court stated, "the privilege does not apply as to communications during the period of time that the parties were not in an adversarial posture" (*id.* at *8). However, the court stated, the privilege would apply to communications that occurred after an adversarial relationship (if any) developed between NAMA and Alliance, depending on their content, and the court noted that there was evidence indicating that an adversarial relationship "may" date back to 2003 (*id.* at *9).

The court directed the special referee specifically to consider whether NAMA and Alliance ever developed an adversarial relationship. It also directed the referee to consider whether the crime-fraud exception applied to the communications itemized in the privilege log, to consider other relevant issues such as a spoliation claim raised by NAMA, and to conduct an examination of individual documents to determine, inter alia, whether they could be withheld under the joint-defense and common-interest privilege. The court found that NAMA was entitled to the IMC transfer documents, despite defendants' objections that the documents were irrelevant because the transaction occurred more than a year after the filing of the second amended complaint.

The special referee conducted a hearing focused on whether an adversarial relationship existed between NAMA and Alliance, and concluded that no such relationship existed and that all the documents identified in the privilege log should be produced. He did not make any determination as to spoliation or the crime-fraud exception to the privilege. NAMA moved to confirm the report, and defendants opposed the motion.

In an order entered August 29, 2014, the court confirmed the special referee's report. The court rejected the attorneys' argument that it had already found an adversarial relationship,

stating that it "made no conclusion [in the 2013 order] as to whether there was an adversarial relationship at all, let alone on that particular date [in 2003]" (2014 NY Slip Op 32304[U], *5 [2014]). The court then rejected Greenberg's argument that *Barasch v Williams Real Estate Co., Inc.* (104 AD3d 490 [1st Dept 2013]) mandated a finding of adversity, stating that

> "the finding of adversity in *Bara[s]ch* was highly dependent on the facts of that case and hinged on the type of claim asserted by the plaintiff [i.e. a non-derivative, direct claim by a director/ shareholder against the corporation]. . . . Conversely, the instant claim is brought by NAMA *derivatively*, on behalf of [Alliance]. Therefore, NAMA is not adverse to [Alliance]; in fact, by bringing this claim derivatively, NAMA is seeking to vindicate [Alliance's] rights vis-à-vis the defendant Managers who are alleged to have breached their duties to the company" (2014 NY Slip Op 32304[U], *10.)

The court also rejected Greenberg's arguments that this litigation is *"per se* adverse" and that NAMA's long-standing dispute with the managers evidenced adversity between NAMA and Alliance (*id.* at *11).

The court found the referee's report to be fully supported by the record, citing, for instance, the April 2004 settlement agreement entered into by the managers and Alliance's three member companies, including NAMA, which indicated that any disputes were between NAMA and the managers; testimony of defendant Samson and that of Nigel Alliance, an owner of NAMA, as well as correspondence between NAMA and the managers, confirming the same; and the California arbitration, which further established the existence of a conflict between NAMA and the managers, rather than between NAMA and the Alliance companies.

The court rejected the attorneys' argument that NAMA had no "protectable interest" in the documents pertaining to phase III of the WMC project (*id.* at *16-17).[2] It concluded that the attorneys had failed to demonstrate that NAMA's interest in those documents, or lack thereof, had any bearing on whether the documents should be produced.

---

2. The California arbitration determined that NAMA had lost its interest in phase III, because it placed conditions on its tender of capital for that phase.

The court found that the attorneys waived their argument that the documents contained privileged communications regarding the instant action, because they did not present that argument to the special referee and that, in any event, the attorneys had "failed to offer any competent evidence - or even a citation - in support" (*id.* at *17).

Accordingly, the court ordered defendants to produce all documents identified in the privilege log and any responsive documents relating to the IMC transfer (which it had already directed be produced in the 2013 order).

This appeal followed.

II. Discussion

A. The Fiduciary Exception to the Attorney-Client Privilege

The oldest evidentiary privilege recognized at common law, the attorney-client privilege "fosters the open dialogue between lawyer and client that is deemed essential to effective representation" (*Spectrum Sys. Intl. Corp. v Chemical Bank*, 78 NY2d 371, 377 [1991]). The privilege, now codified in CPLR 4503 (a), "exists to ensure that one seeking legal advice will be able to confide fully and freely in his [or her] attorney, secure in the knowledge that his [or her] confidences will not later be exposed to public view to his [or her] embarrassment or legal detriment" (*Matter of Priest v Hennessy*, 51 NY2d 62, 67-68 [1980]).

"The [attorney-client] privilege, however, is not limitless. It has long been recognized that [it] constitutes an obstacle to the truth-finding process, the invocation of which should be cautiously observed to ensure that its application is consistent with its purpose" (*id.* at 68 [internal quotation marks omitted]). "Defining the limits of the privilege is, of course, not an easy task . . . [since] no clear rule of general application can be simply articulated. Indeed, . . . much ought to depend on the circumstances of each case" (*id.* [internal quotation marks omitted]).

In the corporate context, where a shareholder (or, as here, an investor in a company) brings suit against corporate management for breach of fiduciary duty or similar wrongdoing, courts have carved out a "fiduciary exception" to the privilege that otherwise attaches to communications between management and corporate counsel. This Court has not previously defined the parameters of the exception, so we take the opportunity to do so here.

The fiduciary exception has its origins in English trust law, which long ago recognized that the fiduciary nature of the

relationship between a trustee and a beneficiary of a trust provides an exception to the privilege with respect to communications between the trustee and the trust's attorney (*see* Craig C. Martin & Matthew H. Metcalf, *The Fiduciary Exception to the Attorney-Client Privilege*, 34 Tort & Ins LJ 827, 832-833 [1999]; *Riggs Natl. Bank of Washington, D.C. v Zimmer*, 355 A2d 709, 712 [Del Ch 1976], citing *Talbot v Marshfield*, 2 Drew & Sm 549, 62 Eng Rep 728 [Ch 1865]; *Wynne v Humberston*, 27 Beav 421, 54 Eng Rep 165 [1858]; *In re Mason*, 22 Ch D 609 [1883]). The theory is that when a trustee seeks legal advice in executing his or her fiduciary duties, he or she is acting ultimately on behalf of the beneficiaries of the trust and, accordingly, cannot cloak his or her actions from them, the attorney's "real clients" (*see* 34 Tort & Ins LJ at 832-833; *Riggs*, 355 A2d at 713-714).

In 1970, the U.S. Court of Appeals for the Fifth Circuit extended the fiduciary exception to the corporate environment in *Garner v Wolfinbarger* (430 F2d 1093 [5th Cir 1970], *cert denied* 401 US 974 [1971]), for the first time allowing shareholders to use the exception to pierce the corporate attorney-client privilege. The *Garner* court was persuaded by two English cases that "treat[ed] the relationship between shareholder and company as analogous to that between beneficiaries and trustees" (*id.* at 1102). Relying on those cases and the traditional crime-fraud and joint-representation exceptions for the proposition that the corporate attorney-client privilege is not absolute, the court summarized its reasoning in the following way:

> "[W]here the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance" (*id.* at 1103-1104).[3]

---

3. While the party asserting the privilege—here, defendants—bears the initial burden of establishing the right to protection (*Spectrum Sys. Intl.*, 78 NY2d at 377), *Garner* illustrates that the burden then shifts to the party asserting an exception to the privilege.

Despite its critics,[4] the fiduciary exception has been widely accepted throughout most of the United States in trustee-beneficiary and corporation-shareholder cases (*see e.g. In re United States*, 590 F3d 1305, 1311-1312 [Fed Cir 2009] [noting that the fiduciary exception "is now well established among (federal circuit courts)" and that "no federal court of appeals has rejected the principle, but have only declined to apply the exception in cases where the facts did not justify its application"], *revd and remanded on other grounds sub nom. United States v Jicarilla Apache Nation*, 564 US —, 131 S Ct 2313 [2011] [rejecting application of fiduciary exception to federal government in its capacity as "trustee" of Indian funds]).

Several New York courts have also recognized the fiduciary exception—both in corporation-shareholder and trustee-beneficiary cases—and we are not aware of any that have rejected it outright (*see e.g. Beard v Ames*, 96 AD2d 119, 121 [4th Dept 1983] ["We are persuaded that corporate management, since it has duties which run ultimately to the benefit of the stockholders, cannot hide behind 'an ironclad veil of secrecy' and that under certain circumstances its judgment may be questioned"], quoting *Garner*, 430 F2d at 1101; *Hoopes v Carota*, 142 AD2d 906, 910 [3d Dept 1988], *affd* 74 NY2d 716 [1989]; *Matter of Bank of N.Y. Mellon*, 42 Misc 3d 171, 178-182 [Sup Ct, NY County 2013]; *Matter of Stenovich v Wachtell, Lipton, Rosen & Katz*, 195 Misc 2d 99, 111-113 [Sup Ct, NY County 2003]). Although this Court found the exception to be inapplicable in *Beck v Manufacturers Hanover Trust Co.* (218 AD2d 1, 17-18 [1st Dept 1995])—because the plaintiffs were adverse to the trustee and the communications related to "the handling of the very issues the plaintiffs had been threatening to litigate"—we did not reject the principle (*see also Lehman v Piontkowski*, 84 AD2d 759, 760 [2d Dept 1981] [declining to apply

---

4. *See e.g.* Stephen A. Saltzburg, *Corporate Attorney-Client Privilege in Shareholder Litigation and Similar Cases: Garner Revisited*, 12 Hofstra L Rev 817, 834 (1984) (arguing that *Garner*'s fiduciary exception is not only superfluous given the preexisting exceptions to the attorney-client privilege, but also "would be detrimental to legitimate corporate interests"); Benjamin Cooper, Note, *An Uncertain Privilege: Reexamining Garner v. Wolfinbarger and Its Effect on Attorney-Client Privilege*, 35 Cardozo L Rev 1217 (2014) (arguing that *Garner* should be limited to suits involving predominantly derivative claims).

*Garner* to claims by 40% shareholder against corporation to enforce restrictive covenant in employment agreement]).[5]

In extending the fiduciary exception to the corporate sphere, the *Garner* court set forth a non-exhaustive list of factors that should be considered to determine whether a party has shown good cause for applying the exception in a given case.[6] Since then, several different tests have been formulated; yet it has been said that "[t]he precise meaning of 'good cause' has not been articulated by the New York courts" (Robert A. Barker & Vincent C. Alexander, Evidence in New York State and Federal Courts § 5:9 n 6 [5 West's NY Prac Series 2014]). In *Hoopes v Carota* (142 AD2d 906 [3d Dept 1988]), the Third Department considered several factors that appear tailored to a trustee-beneficiary case but generally correlate with those articulated in *Garner* (*compare Hoopes*, 142 AD2d at 910, *with Garner*, 430 F2d at 1104). The Restatement of the Law Governing Lawyers offers a test that appears more succinct than the others—focusing primarily on the balancing of the requesting party's need for information against the threat to corporate confidentiality (*see* Restatement [Third] of Law Governing Lawyers § 85 [2000]), which is indeed the overarching consideration. However, in its comments section the Restatement sets forth a version of the *Garner* test with no fewer than 10 factors for consideration (*see id.* § 85 and Comment *c*).

---

**5.** In 2002, the legislature amended CPLR 4503 by adding subdivision (a)(2), effectively eliminating the "fiduciary exception" with respect to communications between counsel and the personal representatives of decedents' estates. However, "[b]ecause of the definitional limitations of the amendment, it is a fair inference that the Legislature intended to leave the fiduciary exception intact with respect to attorney-client communications in contexts other than the representation of estate fiduciaries and specified Article 81 guardianships" (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4503:7).

**6.** These factors include (1) "the number of shareholders and the percentage of stock they represent," (2) "the bona fides of the shareholders," (3) "the nature of the shareholders' claim and whether it is obviously colorable," (4) "the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources," (5) "whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality," (6) "whether the communication related to past or to prospective actions," (7) "whether the communication is of advice concerning the litigation itself," (8) "the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing," and (9) "the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons" (430 F2d at 1104).

■ The *Garner* test remains viable, and it strikes the appropriate balance between respect for the privilege and the need for disclosure; therefore, we adopt it here. It has been generally followed without significantly discouraging corporate attorney-client communications (*see* Restatement [Third] of Law Governing Lawyers § 85, Reporter's Note, Comment *b* ["Although the *Garner* rule does increase uncertainty to some extent, the risk is not great for organizations attempting to comply with the law in good faith"]; Vincent C. Alexander, *The Corporate Attorney-Client Privilege: A Study of the Participants*, 63 St John's L Rev 191, 355-356 [1989] [empirical survey of corporate attorneys suggested that the *Garner* doctrine does not negatively impact corporate attorney-client communications]). Moreover, the requirement of a good-cause showing appropriately accounts for the sensitive nature of discovery disputes over attorney-client privilege, particularly in the corporate context.[7]

Here, the motion court determined that NAMA demonstrated good cause to apply the fiduciary exception to the withheld communications without considering the factors set forth in either *Garner* or *Hoopes*. Indeed, the only support for the finding of good cause in the 2013 order is the California arbitral finding that the managers had "abdicated" their duties to Alliance during a period of time in which some of the communications took place. This is relevant to whether plaintiff's claims against defendants are "colorable" (*see Garner*, 430 F2d at 1104) but it indicates nothing about the other good-cause factors. For example, we do not know whether the approximately 3,000 communications on the privilege log pertain to past or prospective actions, whether the information sought is available from

---

7. In *Hoopes*, the Third Department acknowledged that some courts in other jurisdictions have held that "the privilege does not attach at all" where a fiduciary relationship exists, but the court utilized a good-cause test because, "[t]o the extent that . . . decisions [requiring good cause] emphasize a case-by-case analysis, weighing the individual circumstances presented to determine whether or not the privilege should apply, they appear to be more consistent with the approach to attorney-client privilege issues adopted by the Court of Appeals" (142 AD2d at 909-910). We agree. A blanket application of the exception whenever a fiduciary relationship is present would too easily abrogate the privilege, thereby discouraging candid discussion between corporate attorneys and management.

other sources, or whether any of the communications concern advice regarding the instant litigation.[8]

Thus, although defendants do not take issue with the motion court's finding of good cause—they focus on the determination that there never was an adversarial relationship between NAMA and Alliance—we conclude that the case must be remanded for the court to conduct a comprehensive good-cause analysis. The court, given its discretion under CPLR article 31, may not need to evaluate each factor listed in *Garner*. However, where a court finds that a shareholder has demonstrated good cause to apply the fiduciary exception and pierce the corporate attorney-client privilege, it must at least address those factors that support such a finding. This type of scrutiny is vital to ensure that courts do not arbitrarily order disclosure of corporate attorney-client communications.

B. Adversity: A Threshold Question or "Good Cause" Factor?

Defendants place great emphasis on what they term the "adversity limitation," which they contend is dispositive; they maintain that, if at some point NAMA pursued interests that were adverse to those of Alliance, then the fiduciary exception would be inapplicable to any communications between the managers and counsel from that point forward. Thus, defendants argue, on the ground that the parties have been adverse since 2003, that NAMA is not entitled to any of the withheld communications, regardless of whether adversity is a threshold question or a component of the good-cause inquiry. Conversely, NAMA contends that it is entitled to all the withheld communications because there is no adversity limitation to the fiduciary exception and, in any event, NAMA was never adverse to Alliance. As is often the case, the resolution of this issue lies somewhere between the parties' positions.

■ While some factors in the *Garner* test are relevant to a determination of adversity, *Garner* did not create a categorical adversity limitation. Thus, adversity is not a threshold inquiry but a component of the broader good-cause inquiry. Moreover, of the *Garner* factors that pertain to adversity, some will indicate whether the parties are generally adverse, while others will require a review of the communications in dispute; the relevant factors may weigh against finding good cause to apply the fiduciary exception with respect to those communications

---

8. Defendants contend that the first several communications on the privilege log concern the instant action.

that reveal adversity. Accordingly, a court may find that the party seeking disclosure has shown good cause to be given access to some communications but not others.

The first two factors in the *Garner* test—the number of shareholders and the percentage of shares they represent, and the bona fides of the shareholders (430 F2d at 1104)[9]—are relevant to adversity. That NAMA is a 70% majority investor in Alliance and is suing the managers derivatively suggests that it is not, in this action, generally adverse to Alliance. However, while the derivative nature of a shareholder's claim tends to support a finding of good cause, it is not dispositive.[10] As the *Garner* court explained, in connection with motions to dismiss the derivative claim from that action, its "decision d[id] not turn on whether that claim [was] in the case or out" (430 F2d at 1097 n 11). The Fifth Circuit has since observed that a non-derivative suit creates more problems for a plaintiff arguing good cause, but it did not state that good cause could not be shown; it explained that the shareholder's motivations in such a case are "more subject to careful scrutiny" in determining whether good cause exists (*Ward v Succession of Freeman*, 854 F2d 780, 786 [5th Cir 1988], *cert denied* 490 US 1065 [1989]; *see also* Alexander, 63 St John's L Rev at 364-365).

Analysis of other *Garner* factors that might reveal adversity—for example, "whether the communication related to past or to prospective actions" or "whether the communication is of advice concerning the litigation itself" (430 F2d at 1104)—will ordinarily require in camera review of the communication(s). If the documents or other evidence objectively demonstrate an adverse relationship between the shareholder plaintiff and corporate management, then those communications that (1) concerned "how to deal with" the plaintiff (*Barasch*, 104 AD3d

---

**9.** These factors correspond with the "identity of interests" factor in the *Hoopes* analysis (142 AD2d at 910).

**10.** As defendants point out, the motion court distinguished this case from *Barasch v Williams Real Estate Co., Inc.* (104 AD3d 490 [2013]) on the ground that NAMA sued derivatively and therefore was not adverse to the Alliance Companies. However, *Barasch* did not turn on the petitioner's assertion of a direct claim against the corporation; it held that the petitioner, a shareholder-director suing in her capacity as a shareholder, could not use her position as a director to waive the corporate attorney-client privilege to gain access to privileged communications concerning "how to deal with [her]," because she was adverse to the corporation as demonstrated by emails between the other directors and counsel and by the petitioner's retention of separate counsel (104 AD3d at 492).

at 492), (2) were "specifically relevant to the handling of the very issues the plaintiff[ ] had been threatening to litigate" (*Beck*, 218 AD2d at 17-18), or (3) were "of advice concerning the litigation itself" (*Garner*, 430 F2d at 1104) will likely remain privileged—unless other factors are strong enough to establish good cause.[11] Other communications that are germane to the allegations in the complaint, even those that occurred after adversity arose, would still be discoverable pursuant to the fiduciary exception (provided good cause exists). This communication-specific adversity inquiry operates as a fail-safe, maintaining balance in the operation of the fiduciary exception; where communications evince an adverse relation-ship and contain advice on how corporate management might handle the shareholder, a finding of good cause is less likely. Without such an inquiry, particularly where, as here, the with-held communications are so numerous, the danger of ordering disclosure of privileged communications is significant.

The adversity question is therefore not one of timing, as de-fendants contend, but is answered by the communications' content. For this reason, we reject defendants' argument that, if NAMA were adverse to Alliance at some point, *all* subsequent communications between the managers and the attorneys would rest beyond the fiduciary exception's reach. Communica-tions regarding defendants' alleged breach of fiduciary duties could have occurred at the same time as attorney-client com-munications regarding how to deal with NAMA (for example, during the California arbitration); it would frustrate the balancing of interests in attorney-client privilege cases to permit defendants to withhold communications that might reveal the alleged wrongful conduct simply because the parties were adverse at some point in the past. Thus, the motion court correctly stated that whether communications that occurred after an adversarial relationship developed are privileged depends on their content.

This is where a court's ability to conduct in camera review of the communications is crucial (*see Spectrum Sys. Intl.*, 78 NY2d at 378 ["whether a particular document is or is not protected is necessarily a fact-specific determination, most often requiring

**11.** Although *Barasch* is not binding here, because it addressed adversity outside the context of the fiduciary exception, we find its analysis (together with *Beck*'s) instructive with respect to the nature of the relationship between a shareholder and a corporate board (*see Barasch*, 104 AD3d at 492; *Beck*, 218 AD2d at 17-18).

in camera review" (citation omitted)]; *see also Stenovich*, 195 Misc 2d at 102 [discussing court's in camera review of arguably privileged documents]). Absent a review of the communications (or at least a sampling thereof), it would be impossible to determine whether they involved advice concerning the instant litigation or "how to deal with" NAMA.[12]

We recognize that this case presents the motion court with a difficult task, given the number of communications listed on the privilege log. In addition, we are mindful of the latitude to be accorded to the motion court's discovery determinations under CPLR article 31 (*see Gumbs v Flushing Town Ctr. III, L.P.*, 114 AD3d 573 [1st Dept 2014]). However, it is uncontested that the special referee did not review a single document in camera, despite being instructed by the motion court to conduct an item-by-item review. Therefore, we cannot affirm an order directing the production of more than 3,000 purportedly privileged communications without a single one of those communications having been reviewed.[13]

## C. IMC Transfer and Phase III Documents

We agree with the motion court that the IMC transfer documents are discoverable, since they are relevant where the transaction allegedly resulted in the forfeiture of Alliance's entire interest in the WMC project, notwithstanding that the transaction occurred after the events described in the second amended complaint. Defendants may raise issues of privilege with respect to those documents if so advised.

---

**12.** The descriptions of some of the items listed on the privilege log suggest that certain communications occurred at a time when NAMA had hired separate counsel and concerned how the managers would handle disputes with NAMA, for example, "Attorney client email correspondence re draft response to NAMA," "Attorney client email correspondence teleconference with NAMA's counsel," and "Attorney client email correspondence re Alliance settlement with NAMA." Others appear to be less related to how to deal with NAMA (e.g. "Internal email correspondence re Operating Agreement)," "Internal email correspondence re Articles of Merger," "Attorney client email correspondence re distribution of money," "Attorney client email correspondence re partnerships and capital gains." To determine whether these communications involved advice concerning the instant litigation and whether the managers were seeking advice on how to deal with NAMA, the communications themselves would have to be reviewed.

**13.** Since the fiduciary exception does not apply to attorney work product (*see Jicarilla Apache Nation v United States*, 88 Fed Cl 1, 12-13 [2009], *mandamus denied and remanded on other grounds* 460 Fed Appx 914 [Fed Cir 2011]; Martin & Metcalf, *The Fiduciary Exception*, 34 Tort & Ins LJ at 857), it may also be necessary to inspect some of the documents to determine whether they were prepared in anticipation of litigation.

We agree with defendants that the phase III documents fall outside the fiduciary exception. NAMA concedes that, as a result of the California arbitration proceedings, it lost all rights and interests in the third phase of the WMC project. Because NAMA has no interest in phase III, Alliance and the managers have no fiduciary duty to NAMA with respect to that phase. Thus, NAMA is not entitled to rely on the fiduciary exception to obtain privileged attorney-client communications related to phase III of the WMC project.

III. Conclusion

Accordingly, the orders of Supreme Court, New York County (Eileen Bransten, J.), entered April 30, 2013 and August 29, 2014, which granted plaintiff's motion to compel the production of certain privileged documents, should be reversed, on the law, with costs, the motion denied, and the matter remanded for further proceedings consistent herewith.

FRIEDMAN, J.P., MOSKOWITZ, RICHTER and KAPNICK, JJ., concur.

Orders, Supreme Court, New York County, entered April 30, 2013 and August 29, 2014, reversed, on the law, with costs, the motion denied, and the matter remanded for further proceedings consistent herewith.