LNC INVESTMENTS, INC. and Charter National Life Insurance Company, Plaintiffs,

v.

FIRST FIDELITY BANK, NATIONAL ASSOCIATION, New Jersey, United Jersey Bank, National Westminster Bank, N.J., Riker, Danzig, Scherer, Hyland & Perretti and Clapp & Eisenberg, Defendants.

No. 92 Civ. 7584 (MBM).

United States District Court, S.D. New York.

Aug. 1, 1996.

Seth T. Taube, McCarter & English, New York City, for First Fidelity Bank, N.A.

Robert C. Myers, Heather K. McDevitt, Dewey Ballantine, New York City, for Shawmut Bank Connecticut, N.A.

Mitchell A. Karlan, Gibson, Dunn & Crutcher, New York City, pro se.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs LNC Investments, Inc. and Charter National Life Insurance Company invested in an equipment trust (the "Trust") established by defendant First Fidelity with Eastern Airlines in 1986. Plaintiffs have sued several trustees for violation of the Trust Indenture Act's ("TIA") prudent person requirement, breach of the Indenture's prudent person requirement, and breach of fiduciary duties under the Indenture and New York common law. Plaintiffs have sued also the law firms Riker, Danzig, Scherer, Hyland & Perretti ("Riker, Danzig"), and Clapp & Eisenberg for malpractice, alleging that those firms negligently advised their clients.

First Fidelity, the collateral trustee, moves to implead Shawmut Bank Connecticut, N.A. and Shawmut's attorneys, Gibson, Dunn and Crutcher ("Gibson, Dunn"), as third-party defendants on the following theories: (1) contribution under the TIA, (2) contribution under New York law, and (3) indemnification under New York law. For the reasons that follow, First Fidelity's motion is granted only to the extent that First Fidelity seeks contribution from Shawmut under New York law, and is denied in all other respects.

## I.

The subject matter of the underlying case has been the focus of three prior opinions, familiarity with which is assumed for current purposes. *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1994 WL 73648 (S.D.N.Y. Mar. 3, 1994); *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1994 WL 225408 (S.D.N.Y. May 26, 1994); *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1995 WL 231322 (S.D.N.Y. Apr. 19, 1995). I will restate the facts only briefly here.

First Fidelity and Eastern established the Trust in 1986 pursuant to a Secured Equipment Indenture and Lease Agreement. The Trust sold certificates to investors, used the proceeds to buy airplanes from Eastern, and then leased those planes back to the airline. (Second Amended Compl. ("SAC") ¶¶ 10, 11, 14) Eastern's lease payments enabled the trust to repay principal and interest to certificate holders. The terms of the Trust, and the responsibilities of the various parties, were defined by the "Secured Equipment Indenture and Lease Agreement," dated November 15, 1986, and a "Second Supplemental Indenture," dated February 18, 1987 (together, the "Indenture").

The Trust issued three series of trust certificates, with declining rights of priority to payment, graduated interest rates and increasingly distant maturity dates. (*Id.* at ¶¶ 11, 12) A different trustee was appointed to protect the rights of the investors in each series. Midlantic Bank served as First Series Trustee, United Jersey Bank ("UJB") as Second Series Trustee, and National Westminster Bank, N.J. ("NatWest"), as Third Series Trustee from the date of the Second Supplemental Indenture until August 31, 1990, when it resigned and was succeeded by Shawmut. (*Id.* at ¶ 15) Shawmut served as Third Series Trustee for the remainder of the life of the trust. The Indenture appointed First Fidelity as the "Collateral Trustee," and First Fidelity so served for the duration of the trust. (SAC ¶¶ 15, 16) Riker, Danzig served as counsel to First Fidelity, Clapp & Eisenberg represented UJB, and Gibson, Dunn advised both Shawmut and Natwest at all times relevant to this action.

On March 9, 1989, Eastern filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 1–1330 (1994). The filing resulted in an automatic stay of all actions or claims against Eastern, 11 U.S.C. § 362(a) (1994), and prevented the Trust from recovering the airplanes—the trust collateral. Just before Eastern filed for bankruptcy, an independent appraiser valued the airplanes at approximately $682 million and cautioned that their value would decline rapidly in the near future. (SAC ¶¶ 19, 20) A year-and-a-half later, on November 14, 1990, the trustees moved to lift the stay. (*Id.* at ¶ 29) By the time the stay was lifted on January 18, 1991, the value of the collateral aircraft had plummeted, leaving the

certificate holders undersecured. (*Id.* at ¶ 25) Second series certificate holders will receive only part of their principal and no interest, and third series certificate holders will receive neither principal nor interest. (*Id.* at ¶ 27)

Plaintiffs contend that these losses could have been prevented if the trustees had requested a lifting of the stay when bankruptcy first was declared. The trustees' failure to do so, plaintiffs maintain, breached: (1) the prudent man requirement of the TIA, 15 U.S.C. § 77*ooo*(c) (1994), (2) the prudent man requirement of the agreement, §§ 9.02 and 9A.01 of the Indenture, and (3) fiduciary duties under the Indenture and New York common law. (SAC ¶¶ 33–47)

The first of the three prior opinions in this case dismissed plaintiffs' complaint with leave to amend to allege events of default other than Eastern's filing of the bankruptcy petition. That opinion also required plaintiffs to post an undertaking upon the filing of the amended complaint. *LNC Investments, Inc. v. First Fidelity Bank,* No. 92 Civ. 7584, 1994 WL 73648 (S.D.N.Y. Mar. 3, 1994). In the second opinion I eliminated the requirement that plaintiffs post an undertaking, after determining that plaintiffs owned more than 10% of the outstanding trust certificates and therefore were protected from the undertaking requirement by § 7.11 of the Indenture. *LNC Investments, Inc. v. First Fidelity Bank,* No. 92 Civ. 7584, 1994 WL 225408 (S.D.N.Y. May 26, 1994). Finally, in the third opinion I denied defendants' Rule 12(b)(6) motion to dismiss the amended complaint, for the reason that a hypothetical determination of a Bankruptcy Court's ruling on a prompt motion to lift the stay could not be made before trial, and that absent such a determination the complaint could not be dismissed. *LNC Investments, Inc. v. First Fidelity Bank,* No. 92 Civ. 7584, 1995 WL 231322 (S.D.N.Y. Apr. 19, 1995).

In defense of the action, Third Series Trustee NatWest filed a third-party complaint against its successor Third Series Trustee Shawmut for both contribution and indemnification. Shawmut moved to dismiss that complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief could be granted. Before that motion was decided, Fleet Financial Group, Shawmut's parent corporation, acquired NatWest. *See* Saul Hansell, *Fleet Buys Nat-West Cheap, in a Deal that's Widely Applauded,* N.Y. Times, Dec. 20, 1995, at D8. As a result, the third-party action between NatWest and Shawmut was dismissed without prejudice by stipulation of the parties. (4/30/96 Stip. of Dismissal)

On April 19, 1996, First Fidelity filed the present motion to implead Shawmut and Gibson, Dunn.

## II.

■ Rule 14(a) of the Federal Rules of Civil Procedure allows a defending party to implead a party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed.R.Civ.P. 14(a). A defending party may file a third-party complaint without leave of court, within 10 days after serving the answer. Thereafter, however, the third-party plaintiff must obtain leave of court to implead another party. *Id.* Leave should be granted when, after considering the delay by the movant, the complication of trial, and the merits of the proposed third-party complaint, the court concludes that the benefits of consolidation outweigh the prejudice to plaintiff and third-party defendants. *State of New York v. Solvent Chem. Co.,* 875 F.Supp. 1015, 1021 (S.D.N.Y.1995).

One factor relevant here is First Fidelity's delay before making this motion. Plaintiffs filed their first complaint against First Fidelity on October 16, 1992. That complaint was amended on April 6, 1994, and amended again on May 25, 1995. First Fidelity did not file this motion for more than three-and-a-half years after the filing of the original complaint, and for almost a year after the filing of the operative complaint.

First Fidelity explains that it did not attempt to implead Shawmut sooner because until recently Shawmut was a part of this case by virtue of NatWest's third-party action against it. First Fidelity suggests that while NatWest's third-party complaint was pending against Shawmut, it too could seek

contribution and indemnification from Shawmut. That argument fundamentally mischaracterizes the nature of a litigation. Shawmut was in this case only to respond to NatWest's specific claims against it; Shawmut was not in the case to respond to all claims made by all parties. Any outcome of Shawmut's motion to dismiss NatWest's third-party complaint would have been irrelevant to First Fidelity's motion to implead and does not justify First Fidelity's two-year delay. That unreasonable delay is not dispositive, but must be considered along with the merits of the motion.

With respect to Gibson, Dunn, First Fidelity argues that it could not have moved earlier to implead because it was not aware of Gibson, Dunn's important role in the transactions at issue. That argument too is flawed, because it is contrary to the facts of this case, as well as First Fidelity's own assertions. Gibson, Dunn has been involved in the transactions giving rise to this action since 1988, when it was retained as counsel to Third Series Trustee NatWest. Thereafter, Gibson, Dunn served as counsel to Third Series Trustee Shawmut, and represented both Third Series Trustees in the Eastern Bankruptcy proceeding. First Fidelity itself asserts that "First Fidelity's representatives were engaged in a 'face-to-face' relationship with members of [Gibson, Dunn] in relation to the transactions at issue." (5/3/96 Taube Ltr. at 3) Indeed, First Fidelity claims that its relationship with Gibson, Dunn approached privity, *infra* p. 41, a claim that belies First Fidelity's assertion that it was not aware until recently of Gibson, Dunn's role.

Moreover, to allow impleader of Gibson, Dunn at this stage of the litigation would unduly prejudice plaintiffs and proposed third-party defendants. Discovery is near completion and the case, which has been pending for over four years, finally is heading towards trial. The addition of a party that has barely participated in discovery would delay resolution of the underlying issues by extending discovery and generating additional pre-trial motions. Because First Fidelity has proffered no good reason for delay, the prejudice caused by delay weighs against granting the motion.

### III.

Rule 14 provides only the procedural mechanism for impleader; the substantive merit of the action depends on the federal or state theory of contribution, indemnity or subrogation, or any other theory asserted in the third-party complaint. *Kim v. Fujikawa*, 871 F.2d 1427, 1434 (9th Cir.1989); *Stratton Group, Ltd. v. Sprayregen*, 466 F.Supp. 1180, 1186 (S.D.N.Y.1979). That the third-party defendant may be liable to the original plaintiff is not enough to sustain impleader, which is available only when the third-party's liability is "dependent on the outcome of the main claim" or derivative of the main claim, or when the third party potentially is secondarily liable to the defendant. *Kenneth Leventhal & Co. v. Joyner Wholesale Co.*, 736 F.2d 29, 31–32 (2d Cir.1984); *Unilease Computer Corp. v. Major Computer Inc.*, 126 F.R.D. 490, 492–93 (S.D.N.Y.1989); *Index Fund, Inc. v. Hagopian*, 417 F.Supp. 738, 743–46 (S.D.N.Y.1976).

First Fidelity seeks to implead Shawmut for contribution for its alleged breach of § 315(c) of the TIA, which imposes the "prudent man" requirement. That section states:

> The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

15 U.S.C. § 77ooo(c) (1994).

The threshold issue is whether the TIA creates a private right of action. Although the parties have not disputed this issue, the answer cannot be taken for granted, and an affirmative answer is necessary to support jurisdiction. Because the "prudent man" section of the TIA does not include language to the effect that aggrieved persons may sue, the statute does not create an express right of action. The court may infer, however, that the right exists. *Zeffiro v. First Pennsylvania Banking*, 623 F.2d 290, 295–99 (3d Cir.1980) (applying the test of

*Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and concluding that a right of action may be inferred under § 315(c) of the TIA), *cert. denied,* 456 U.S. 1005, 102 S.Ct. 2295, 73 L.Ed.2d 1299 (1982); *In Re Equity Funding Corp. of America Sec. Litig.,* 416 F.Supp. 161, 203 (C.D.Cal.1976) (adopting the approach of *Morris v. Cantor, infra* ), *aff'd,* 603 F.2d 1353 (9th Cir.1979); *Morris v. Cantor,* 390 F.Supp. 817, 822 (S.D.N.Y.1975) (deriving right to sue from jurisdictional section of TIA); *see also Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 426 n. 17, 92 S.Ct. 1678, 1684 n. 17, 32 L.Ed.2d 195 (1972) (suggesting that the TIA creates a private right of action, but declining to decide the issue). In *Zeffiro,* the Third Circuit set forth a full and persuasive analysis of why the right to sue should be inferred. *Zeffiro,* 623 F.2d at 295–99. The Second Circuit recently has cited *Zeffiro* with approval, and acknowledged that it "established a private cause of action under the [TIA]." *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.,* 85 F.3d 970, 974 (2d Cir. 1996).

Both text and legislative history support the inference that Congress intended to permit debenture holders to sue in federal court. Section 302(a) of the TIA declares that the purpose of the Act is to serve the "national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein." 15 U.S.C. § 77bbb(a) (1994). A private right of action for investors helps to achieve that purpose.

Moreover, § 315(d) of the TIA, 15 U.S.C. § 77*ooo*(d), part of the same section as the prudent man requirement, states that "[t]he indenture to be qualified shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct," except under specified circumstances. That section reflects Congress' awareness that the trustee may be sued for negligence or willful misconduct by those injured by that conduct. *See* Morris N. Simkin, *The Central Bank Case: A Warning Light for Indenture Trustees,* N.Y.L.J., Oct. 21, 1993, at 1 (citing § 315(d) to support

the proposition that "the TIA was amended in the Trust Indenture Reform Act of 1990 to clarify that there is a private cause of action for its violation."). Section 315(d), however, does not change the source of the § 315(c) right of action; it is implied, not express.

Section 315(e) of the TIA, also part of the same section as the prudent man requirement, explains the circumstances under which a court may require one of the parties to "any suit against the trustee for any action taken or omitted by it as trustee," to post an undertaking and explicitly refers to suits instituted by "any indenture security holder, or group of indenture security holders." 15 U.S.C. § 77*ooo*(e) (1994). The quoted language does not appear to refer to the sole express private cause of action under the TIA, § 323, 15 U.S.C. § 77www(a) (1994), because that section imposes liability only for material misstatements or omissions in a report filed with the SEC. A reference to § 323 more likely and more precisely would refer to material misstatements or omissions, rather than to actions taken or omitted. If the quoted language does not refer to § 323, that language is over-broad unless indenture security holders—that is, private parties— may sue the trustee for actions taken or omitted.

It is significant also that once an indenture has been registered with the SEC, that agency is unable to enforce the TIA. Section 309 of the Act states that SEC is not empowered "to conduct an investigation or other proceeding for the purpose of determining whether the provisions of an indenture which has been qualified under this subchapter are being complied with, or to enforce such provisions." 15 U.S.C. § 77iii(e) (1994). The SEC's only affirmative powers lie in qualifying indentures and receiving the required reports. 15 U.S.C. §§ 77sss–77uuu (1994). That Congress intended the SEC to have only a minimal enforcement role is confirmed by the legislative history, which recites that

> [t]he Commission will have no powers with respect to enforcement of the provisions of the indenture. After the indenture has been executed it will be enforceable only by the parties like any other contract.

S.Rep. No. 248, 76th Cong., 1st Sess. 2 (1939). If private parties may not sue to enforce the statute, and the SEC is explicitly barred from doing so, the command in § 315(c) of the TIA that the trustee shall exercise the care of a "prudent man" is simply an exhortation that no one can enforce. I refuse to read what Congress passes and the President signs as a sermon or a cheer, rather than a law.

Finally, it is important to note that the jurisdictional section of the Act, § 322(b), authorizes federal jurisdiction for "actions brought to enforce any liability or duty created by" the Act. 15 U.S.C. § 77vvv(b) (1994). The generality of that section suggests that its application is not limited to the single section of the Act, § 323(a), that expressly grants a private right of action. 15 U.S.C. § 77www(a) (1994) (imposing civil liability for material misstatements and omissions in a report filed with the SEC); *see* 9 Louis Loss & Joel Seligman, *Securities Regulation* 4455 (3d ed. 1990) (stating that a private right of action under the TIA was created first by implication, "then in 1990 by amendment of § 322(b) to create a private cause of action for enforcement of mandatory indenture terms."). If Congress created jurisdiction to enforce that duty only, the words "any liability or duty" in § 322 would be misleading. Again, I refuse to interpret the words of Congress in a way that does not cohere with the rest of the statute, or with common sense. By phrasing the jurisdictional grant so generally, and by isolating that grant in its own section rather than including it in § 323, Congress indicated that other duties imposed by the statute also may be enforced by private parties.

### IV.

 Next, it is necessary to determine whether a defendant sued under § 315(c) of the TIA may seek contribution from a third party. Just as § 315 of the TIA does not expressly create a private right of action, so too that section does not expressly create a right of contribution. When a federal statute condemns an act as unlawful, the extent and nature of a defendant's liability are federal questions to be determined in accordance with the statute and the federal policy it promotes. *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 173–74, 87 L.Ed. 165 (1942). Although this does not mean that state law is inapplicable in every case, *see, e.g., Burks v. Lasker,* 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979) (applying state law limits on the powers of corporate directors under federal statutes), many courts have held that the existence, scope and limitations of a right of contribution under a federal statute are governed by federal law. *See Northwest Airlines v. Transport Workers Union,* 451 U.S. 77, 90–91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981) (Title VII and Equal Pay Act); *Fleming v. Lind–Waldock & Co.,* 922 F.2d 20, 27 (1st Cir.1990) (Commodity Exchange Act); *Donovan v. Robbins,* 752 F.2d 1170, 1179 (7th Cir.1985) (ERISA). A departure from that principle would be unjustified when applying the TIA, whose express purpose is to achieve nationwide uniformity of at least minimally acceptable conduct for indenture trustees. S.Rep. No. 248, 76th Cong., 1st Sess. 3–4 (1939) ("To the extent that the types of trust indenture now in common use are inadequate, it is clear that such inadequacy presents a national problem which cannot be dealt with effectively by the States.") Federal law, therefore, controls whether there is a right of contribution under the TIA and, if so, the dimensions of that right. *See also Bluebird Partners,* 85 F.3d at 973–74 (holding that federal law governs the assignability of TIA claims).

The Supreme Court's trilogy of implied right of contribution cases, *Northwest Airlines v. Transport Workers Union,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), *Texas Industries, Inc. v. Radcliff Materials,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), and *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 296–98, 113 S.Ct. 2085, 2091, 124 L.Ed.2d 194 (1993), governs the analysis here.

In *Northwest Airlines,* the Court declined to find an implied right of contribution under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The Court first looked to the text of the statute and

noted the absence of an explicit right to contribution. 451 U.S. at 91, 101 S.Ct. at 1580. The Court then found that petitioners were members of the class of persons the statute was enacted to benefit. *Id.* at 91–92, 101 S.Ct. at 1580–81 (reasoning that Title VII does not protect employers). Moreover, the Court maintained, Congress intended Title VII and the Equal Pay Act to establish a comprehensive remedial scheme for employment discrimination and did not intend that additional or supplemental remedies be created. *Id.* at 93–94, 101 S.Ct. at 1581–82. Last, the Court noted the lack of discussion or even suggestion of a right of contribution in the legislative history of the statutes. *Id.* at 94, 101 S.Ct. at 1582. Without an affirmative sign from Congress, the Court concluded that it had no choice but to deny petitioner's third-party claim.

In *Texas Industries*, the Court declined to find an implied right of contribution under the federal antitrust statutes, § 1 of the Sherman Act, 15 U.S.C. § 1, and § 4 of the Clayton Act, 15 U.S.C. § 15. There, the Court again found no Congressional intent to create a right of contribution. The Court observed that the parties seeking contribution—concrete manufacturers allegedly involved in a conspiracy to restrain trade—were not within the class of persons the statute intended to benefit, and that the Act's imposition of treble damages revealed "an intent to punish past and to deter future, unlawful conduct," rather than an intent "to ameliorate the liability of wrongdoers." 451 U.S. at 639, 101 S.Ct. at 2066. Moreover, the legislative history was devoid of evidence that Congress was concerned with "softening the blow on joint wrongdoers." *Id.* As in *Northwest Airlines*, the absence of any indicia of Congressional intent precluded the court from recognizing an implied right of contribution under the antitrust statutes.

In *Musick, Peeler* the Court reached the opposite conclusion and recognized an implied statutory right to contribution under § 10(b) of the Securities Act of 1934 and Rule 10b–5 promulgated thereunder. At the outset, the Court noted a fundamental difference between *Musick, Peeler* and its predecessors: *Northwest Airlines* and *Texas In-*

*dustries* involved rights of contribution in defense of an *express* cause of action while *Musick, Peeler* concerned a right of contribution in defense of an *implied* cause of action. The 10b–5 right of action, the Court explained, had been created by the judiciary "on the theory courts should recognize private remedies to supplement federal statutory duties, not on the theory Congress had given an unequivocal direction to the courts to do so." *Musick, Peeler,* 508 U.S. at 291, 113 S.Ct. at 2088. Because of that pedigree, a narrow inquiry into Congressional intent would be futile.

The *Musick, Peeler* Court explained that its task was "not to assess the relative merits of the competing rules, but ... to attempt to infer how the 1934 Congress would have addressed the issue had the 10b–5 action been included as an express provision in the 1934 Act." 508 U.S. at 294, 113 S.Ct. at 2090. Finding no guidance from § 10(b) itself, the Court looked to other similarly structured sections of the act—§§ 9 and 18, 15 U.S.C. §§ 78i(e) and 78r(b). Like Rule 10b–5, those sections imposed direct liability on those who violate the securities laws with scienter. Those sections explicitly allowed defendants to seek contribution from joint tort-feasors. Consistency, therefore, required the Court to "adopt a like contribution rule for the right of action existing under 10b–5." *Id.* at 297, 113 S.Ct. at 2091.

The Court noted also that the majority of courts had found an implied right to contribution under § 10(b) and that aware of this precedent, "neither the Securities and Exchange Commission nor the federal courts have suggested that the contribution right detracts from the effectiveness of the 10b–5 implied action or interferes with the effective operation of the securities laws." *Id.* The Court chose not to reverse this wave of cases, and confirmed that an implied right to contribution existed.

The Supreme Court considered implied private rights of action the following term in *Central Bank v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). There, the question presented was whether § 10(b) creates an implied private action for aiding and abet-

ting. The Court characterized that question as one concerning the "scope of the conduct prohibited by § 10(b)," as opposed to one "about the elements of the 10b–5 private liability scheme." *Id.* at ——––––, 114 S.Ct. at 1445–46. Questions about the scope of prohibited conduct, the Court explained, must be answered by reference to Congressional intent, and because the conduct was expressly prohibited, that intent could be determined by the text of the statute alone. Application of that approach in *Central Bank* meant that there was no aiding and abetting liability under § 10(b), because the text of the statute did not prohibit that type of conduct. *Id.* at ——––––, 114 S.Ct. at 1447–48.

By contrast, the elements of the § 10(b) private liability scheme cannot be determined by reference to the text of the provision alone, because the text makes no mention of any private liability. To find whether the elements of the liability scheme include a right of contribution, the Court explained, it is necessary to apply the *Musick, Peeler* methodology to determine whether the enacting Congress would have enacted a right of contribution had it made the 10b–5 action express in the 1934 Act. Although unnecessary to its holding, the Supreme Court applied the *Musick, Peeler* method to answer the *Central Bank* question, and in aid of that endeavor,

> use[d] the express causes of action in the securities Acts as the primary model for the § 10(b) action. The reason is evident: Had the 73d Congress enacted a private § 10(b) right of action, it likely would have designed it in a manner similar to the other private rights of action in the securities Acts.

*Id.* at ——, 114 S.Ct. at 1448 (citing *Musick, Peeler*, 508 U.S. at 292–300, 113 S.Ct. at 2089–92). Consistent with that approach, the Court then reviewed all express private causes of action in the 1933 and 1934 Acts and found that none imposed liability on "one who aids or abets a violation." *Id.* at ——, 114 S.Ct. at 1449. From that, the Court inferred that Congress "likely would not have attached aiding and abetting liability to

§ 10(b) had it provided a private § 10(b) cause of action." *Id.*

■ Here, I am presented with a question about the elements of the private liability scheme of an implied right of action. My task, therefore, is to answer the following question: would the 1939 Congress have provided a right of contribution had it included an express private right of action under § 315(c) of the TIA? For the answer, I must look to the sole provision of the TIA granting an express right of action, § 323, 15 U.S.C. § 77www. That section states:

> Any person who shall make or cause to be made any statement in any ... document filed with the [SEC] ... which statement was ... false or misleading with respect to any material fact, or who shall omit to state any material fact ... *shall be liable to any person* (not knowing that such statement was false or misleading or of such omission) who, in reliance upon such a statement or omission, shall have purchased or sold a security issued under the indenture to which such ... document relates, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading or of such omission.

15 U.S.C. § 77www(a) (1994) (enacted in 1939 along with § 315(c)) (emphasis added). That section does not create an express right of contribution in favor of a defendant sued for its violation, and no such right of contribution has been inferred. It is likely, therefore, that the 1939 Congress, if it had made express the private right of action under § 315(c) of the TIA, would have structured that right similarly to the right it created expressly, § 323, and would not have provided defendants with a right of contribution. I note also that First Fidelity has cited no precedent to support a right of contribution under the TIA, and I have found none. Although reliance on precedent alone unnecessarily would retard the development of a right of contribution, because the Supreme Court noted the existence of precedent in *Musick, Peeler*, I note its absence here.

That being said, I note also that § 323 is a meager clue to Congressional intent because

the analogy between that section and § 315(c) of the TIA is not as tight as was the analogy between §§ 9, 18 and 10(b) of the 1934 Securities Act relied on by the Court in *Musick, Peeler.* There, the Court had eight express private rights of action in the 1933 and 1934 Acts from which to choose. After analyzing all of those sections, the court selected the two provisions most analogous to § 10(b) because they imposed the same type of liability (direct), prohibited the same type of conduct (fraudulent), operated to impose liability on multiple defendants acting in concert, and were enacted into law by the same Congress (the 73rd). *Musick, Peeler,* 508 U.S. at 294–98, 113 S.Ct. at 2090–91.

I do not have that luxury here. The TIA contains only one express cause of action— § 323(a), 15 U.S.C. § 77www(a). That section and § 315(c) both impose direct liability and both were enacted in 1939 by the 79th Congress. However, the provisions prohibit different types of conduct. Section 315(c) prohibits a trustee's breach of the prudent man requirement after an event of default, conduct akin to negligence. In contrast, § 323 imposes liability on a trustee who intentionally or recklessly makes a false or misleading statement in a document filed with the SEC. That difference weakens the analogy between the two sections, and as a consequence, weakens the hypothesis that the enacting Congress would have structured the rights of action in like fashion.

Albeit slightly off the mark, § 323 is the only hint the 79th Congress left as to how it wished to allocate liability among those who violated the TIA. Apart from § 323, the statute itself and the legislative history provide no evidence of Congress' intent either to create a right of contribution or not to do so. That silence points to the same result as § 323, because without any affirmative indication of Congress' intent to create a right of contribution, the court has nothing from which to infer that Congress intended the right to exist. *Northwest Airlines,* 451 U.S. at 95, 101 S.Ct. at 1582 ("federal courts, unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers."); *see also Cannon v. University of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring) (stating that federal courts may recognize a cause of action only if it has been created by statute). That rule reflects the principle that legislatures, not courts, enact laws and establish the means by which a violation of those laws may be remedied.

■■■ If a right of contribution can not be inferred from the text of the statute, that right may be recognized only if the court determines that the right should be created as a matter of federal common law. *See Northwest Airlines,* 451 U.S. at 95, 101 S.Ct. at 1582–83; *Texas Industries,* 451 U.S. at 640, 101 S.Ct. at 2066–67. Federal common law may be created: (1) when necessary to protect "uniquely federal" interests, and (2) when Congress has authorized federal courts to develop substantive federal law. *Texas Industries,* 451 U.S. at 640, 101 S.Ct. at 2066–67.[1]

---

1. The analytical framework adopted here is the one used in the Supreme Court cases addressing the implication of a right of contribution. However, certain commentators have organized the analysis somewhat differently. *See, e.g.,* Edwin Chemerinsky, *Federal Jurisdiction* § 6.1, at 336 (2d ed. 1994) (dividing federal common law into: (1) rules necessary to protect uniquely federal interests, (2) rules created to effectuate Congressional intent, including the implication of private rights of action, (3) *Bivens* actions, and (4) admiralty and maritime law); 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4514, at 463–74 (2d ed. 1996) (classifying federal common law as follows: (1) situations involving a significant conflict between some federal policy or interest and the use of state law—uniquely federal interests, (2) filling the interstices of a

pervasively federal substantive framework, and (3) strong federal concerns originating from the Constitution, tradition, or practical necessity, including implied rights of action); Paul M. Bator, Paul J. Mishkin, Daniel J. Meltzer & David L. Shapiro, *Hart & Weschsler's the Federal Courts & the Federal System,* 849–953 (3d ed. 1988) (dividing federal common law into: (1) the power to define primary obligations, and (2) the remedial power to enforce primary obligations, including the implication of causes of action).

In formulating those categories, these commentators have acknowledged that "very little is clear about the contours of federal common law," Wright, Miller & Cooper § 4514, at that "federal common law has developed in an ad hoc fashion," and that as a result, no "coherent body of legal principles exists." Chemerinsky § 6.1,

Cases involving admiralty law, *see, e.g., Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 113, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974) (establishing an implied right of contribution in an admiralty case), the rights or duties of the United States, *see, e.g., Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943), and the resolution of interstate controversies, *see, e.g., Illinois v. Milwaukee,* 406 U.S. 91, 103–04, 92 S.Ct. 1385, 1392–93, 31 L.Ed.2d 712 (1972), raise issues of uniquely federal concern, are inappropriate for state regulation, and as a result, require federal courts to create federal common law. Cases where there is a "significant conflict between some federal policy or interest and the use of state law," likewise are fit for the creation of federal common law, because absent that creation, the federal policy or interest would be thwarted by the conflicting state law. *O'Melveny & Myers v. Federal Deposit Ins. Corp.,* 512 U.S. 79, ——, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994).

The regulation of indenture trusts does not impact "uniquely federal" interests. Before the enactment of the TIA, only state law regulated indenture trusts, and since the enactment of the TIA, states have continued to regulate indenture agreements. The TIA itself states that

> nothing in this subchapter shall affect ... the jurisdiction of ... any State or political subdivision of any State, over any person or security, insofar as such jurisdiction does not conflict with any provision of this subchapter or any rule, regulation, or order thereunder.

15 U.S.C. § 77zzz (1994). That section recognizes, and courts have held, that states may regulate trust indentures so long as such regulation does not conflict with the TIA. *See, e.g., United States Trust Co. v. First Nat'l City Bank,* 57 A.D.2d 285, 295–97, 394 N.Y.S.2d 653, 660–61 (1st Dep't 1977)

at 335–336. That there is no single organizing principle of federal common law is not surprising. The nature of the common law is that it evolves on a case-by-case basis, and as a result, it defies simple categorization. A common law that could be so encapsulated would be not common law, but law derived from an *a priori* principle.

(holding that the TIA does not abrogate an indenture trustee's common-law, pre-default, fiduciary duty of loyalty), *aff'd,* 45 N.Y.2d 869, 410 N.Y.S.2d 580, 382 N.E.2d 1355 (1980). Whatever federal interests led to the enactment of the TIA permit concurrent state regulation and are not "unique" to the federal government. Further, the application of state law of contribution will not conflict with any significant federal policy or interest; the TIA's goal of uniform protection of investors will be met.

Congressional authorization to federal courts to create governing rules of law also is quite rare. *O'Melveny & Myers,* 512 U.S. at ——, 114 S.Ct. at 2055; *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1444–45, 10 L.Ed.2d 605 (1963). An oft-cited specimen of that rare authorization is § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. That section has been read to vest federal courts with subject-matter jurisdiction *and* with the power to develop a common law of labor-management relations. *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957). Likewise, the Supreme Court has explained that ERISA empowers courts to "develop of a 'federal common law of rights and obligations under ERISA-regulated plans,'" by adopting principles of the common law of trusts. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989); *see also Chemung Canal Trust Co. v. Sovran Bank,* 939 F.2d 12, 16–18 (2d Cir.1991), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992). The Supreme Court so instructed, because:

> ERISA abounds with the language and terminology of trust law.... ERISA's legislative history confirms that the Act's fiduciary responsibility provisions ... codify and make applicable to ERISA fiduciaries certain principles developed in the law of trusts.

I note also that the task at hand is not to provide a comprehensive analysis of the rationale and substance of federal common law, but only to decide the issues presented here. The principles of a decided and binding case, *Texas Industries,* are adequate to that task.

*Firestone,* 489 U.S. at 111, 109 S.Ct. at 954 (citations omitted). Elsewhere, Congress explicitly has directed the federal courts to create a federal law of privilege. Fed. R.Evid. 501 (1994) ("the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience.").

That authorization to create federal common law also is absent here. Neither the text of the TIA, its legislative history, nor case law interpreting it suggests that Congress intended to give courts wide discretion to formulate remedies to enforce the provisions of the TIA, or to afford defendants relief through contribution. In fact, the SEC report and the legislative history show that Congress intended the federal government to regulate the world of trust indentures only minimally, by providing a baseline standard of conduct for all trustees. Congress did not intend otherwise to alter significantly the ability of contracting parties to structure the trust themselves. The Senate Report states that

> [t]hese standards in no wise [*sic*] affect the strictly 'business' features of indentures. The Commission will have no jurisdiction over such matters as the wisdom of the issue or the amount of security to be given therefor, or the offering price, maturity date, interest rate, or sinking-fund provisions. Its only function will be to see that the provisions which relate to the protection and enforcement of the rights of the investors conform to the prescribed standards.

S.Rep. No. 248 at 2. The Senate Report then explains that once an indenture is properly qualified with the SEC, "the enforcement provisions of the indenture may appropriately be left to the bondholders themselves, without continuing supervision by a governmental agency." *Id.* There is no evidence that Congress intended either the SEC or the courts to assume a substantive regulatory role.

Further, the jurisdictional section of the TIA, § 322, provides:

> Jurisdiction of offenses and violations under, and jurisdiction and venue of suits and actions brought to enforce any liability or duty created by, this subchapter, or any rules or regulations or orders prescribed under the authority thereof, shall be as provided in section 22(a) of the Securities Act of 1933 [15 U.S.C. § 77v(a) ].

15 U.S.C. § 77vvv(b) (1994). The provision of the 1933 Act referred to confers concurrent jurisdiction on state and federal courts over suits to enforce any liability created by that statute. 15 U.S.C. § 77v(a); *cf. Texas Indus.,* 451 U.S. at 640–41, 101 S.Ct. at 2067 ("[t]he vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law."). Such concurrent jurisdiction to enforce the TIA, although not alone dispositive, confirms that this is not an area in which the federal courts may create a body of substantive law. *See also Sears, Roebuck & Co. v. Sears Realty Co.,* 932 F.Supp. 392 (N.D.N.Y. 1996) (noting that the lack of exclusive federal jurisdiction under the Lanham Act weighed against creating a federal common law rule to govern settlement agreements).

Simply because courts have inferred from the statute that they should recognize a private right of action, *supra* pp. 1339–1340, and have determined that federal law controls the assignability of TIA claims, *Bluebird,* 85 F.3d at 974, does not suggest that federal courts may construct a remedial scheme under the TIA, including a right of contribution. Federal courts may recognize implied federal law, and may recognize also a need for uniform federal law with respect to certain features of a statute, but simultaneously may recognize that other parts of the regulatory framework neither imply nor authorize a preemptive federal rule. *See, e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (holding it unnecessary to create a uniform federal rule to determine the priority of liens under the Small Business Administration and Farmers Home Administration loan programs).

In *Texas Industries,* for example, the Supreme Court recognized the authority of federal courts to "develop governing principles of law ... with regard to substantive violations" of the Sherman Antitrust Act, but held

that Congress had not given the courts wide discretion with regard to the remedial scheme, and therefore that a right of contribution should not be created. 451 U.S. at 643, 101 S.Ct. at 2068. In reaching that decision, the Court relied on the "sharp distinction between the lawmaking powers conferred in defining violations and the ability to fashion the relief available to the parties claiming injury." *Id.* at 644, 101 S.Ct. at 2069. More specifically, the Court noted that whereas the substantive provisions of the Act were broad and sweeping, the remedial provisions were detailed and specific. That detailed remedial scheme left no room for the creation of a right of contribution by the federal courts. *Id.*

The situation here is somewhat different, but the result is the same. The TIA and its legislative history indicate that Congress sought to create a uniform minimum standard of conduct for indenture trustees to ensure that investors in the various states would be afforded the same minimum protection. Implication of a private right of action under § 315(c) of the TIA rests on that theory of the statute's purpose. Nothing in the statute or legislative history suggests that Congress intended to allocate responsibility among wrongdoers by way of a right of contribution, and denial of that right does not undermine the statute's stated goals. Uniform national standards to protect investors can be achieved even if indenture trustees in some states enjoy a state-law right of contribution, while their counterparts in other states do not.

Because there is no evidence that Congress intended to create a right of contribution under the TIA, or that Congress conferred on federal courts the power to create such a right, First Fidelity's application to file a claim for contribution under the TIA must be denied.

## V.

■ First Fidelity next contends that it may seek contribution from Shawmut and Gibson, Dunn under New York state law— N.Y.Civ.Prac.L. & R. § 1401. That statute states that

two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

N.Y.Civ.Prac.L. & R. § 1401 (McKinney 1976). An action for contribution may be maintained between "concurrent, successive, independent, alternative, and even intentional tort-feasors," *Board of Ed. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 27–28, 523 N.Y.S.2d 475, 478, 517 N.E.2d 1360, 1364 (1987), who have caused the "same injury" to plaintiff. *Nassau Roofing & Sheet Metal Co. v. Facilities Development Co.,* 71 N.Y.2d 599, 603, 528 N.Y.S.2d 516, 518, 523 N.E.2d 803, 805 (1988).

■ However, claims for contribution may not be brought in defense of a breach of contract claim. *Sargent, Webster,* 71 N.Y.2d at 27–28, 523 N.Y.S.2d at 478, 517 N.E.2d at 1363–64. That rule acknowledges that parties have the power to bargain for the scope of their liability when the contract is formed and therefore suffer no injustice when they incur liability within the terms of their agreement. *Id.* at 29, 523 N.Y.S.2d at 479, 517 N.E.2d at 1364–65. To allow contribution in a contract case would offend the principle that limits contract damages to those reasonably foreseeable when the contract is formed. *Id.* at 28, 523 N.Y.S.2d at 479, 517 N.E.2d at 1364–65.

■ The critical question under New York law, then, is whether the claim for which a party seeks contribution is based in contract or in tort. Under New York law, the pre-default duties of an indenture trustee, unlike those of an ordinary trustee, generally are limited to the duties imposed by the indenture. *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71 (2d Cir.1988) ("It is … well-established under state common law that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture…."); *Meckel v. Continental Resources Co.,* 758 F.2d 811, 816 (2d Cir.1985); *New York State Medical Care Facilities Finance Agency v.*

*Bank of Tokyo Trust Co.*, 163 Misc.2d 551, ——, 621 N.Y.S.2d 466, 470 (Sup.Ct.New York County 1994); *AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc.2d 334, 336–38, 573 N.Y.S.2d 204, 206 (Sup.Ct.New York County 1991). An indenture trustee resembles a party to a contract whose duties are defined only by the terms of the indenture. *AMBAC*, 151 Misc.2d at 336–38, 573 N.Y.S.2d at 206. The role of an indenture trustee differs from that of an ordinary trustee because the indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts. *See* Martin D. Sklar, *The Corporate Indenture Trustee: Genuine Fiduciary or Mere Stakeholder?*, 106 Banking L.J. 42 (1989).

■■■■ New York courts have imposed only two extra-contractual pre-default duties on indenture trustees. First, an indenture trustee must avoid conflicts of interest and discharge its obligations "with absolute singleness of purpose," because of the inability of dispersed investors to enforce their rights. *Dabney v. Chase Nat'l Bank*, 196 F.2d 668, 669–71 (2d Cir.1952) (L. Hand, J.); *see also United States Trust Co. v. First Nat'l City Bank*, 57 A.D.2d 285, 295–97, 394 N.Y.S.2d 653, 660–61 (1st Dep't 1977) (holding that the TIA does not abrogate an indenture trustee's common-law fiduciary duty of loyalty), *aff'd* 45 N.Y.2d 869, 410 N.Y.S.2d 580, 382 N.E.2d 1355 (1978); *In re E.F. Hutton Southwest Properties II, Ltd.*, 953 F.2d 963, 969–72 (5th Cir.1992) (summarizing New York law on indenture trustees as follows: "fiduciary duties . . . are not activated until a conflict arises where it is evident that the indenture trustee may be sacrificing the interests of the beneficiaries in favor of its own financial position."). Second, an indenture trustee may be liable in tort for failure to perform basic non-discretionary ministerial tasks. *New York State Medical Care Facilities*, 163 Misc.2d at ——, 621 N.Y.S.2d at 470 (holding trustee liable for failure to notify bondholders of early redemption call).

After an event of default, however, the loyalties of an indenture trustee no longer are divided between the issuer and the investors, and as a consequence, New York law reallocates the indenture trustee's fiduciary duties to reflect that change. In *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 632 N.Y.S.2d 520 (1st Dep't 1995), the First Department acknowledged the limits on an indenture trustee's duties before an event of default, but explained that those limits do not apply after an event of default, because at that point

> it is clear that the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture.

*Id.* at 12, 632 N.Y.S.2d at 527. After an event of default, "it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the rights of the bondholders to recover what they are owed will ultimately be vindicated." *Id.* Relying on that reality, public policy, and the purposes of an indenture, the Court held that an indenture trustee could not enforce broad exculpatory provisions to excuse the trustee's failure to exercise powers under the indenture. *Id.*

The Court then analogized to Real Property Law § 126 which requires an indenture trustee for mortgage investments,

> [i]n the case of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

N.Y.Real Prop.L. § 126 (McKinney 1989). A like requirement should apply to an indenture trustee after an event of default, the Court held, "especially in an era when the antiquated and much abused common law rule requiring strict adherence to the indenture terms has been so widely supplanted by remedial legislation such as RPL § 126." *Beck*, 218 A.D.2d at 13, 632 N.Y.S.2d at 528. Accordingly, the Court held:

> The trustee must in the post-default context act prudently, but only in the exercise of those rights and powers granted in the indenture. The scope of the trustee's obligation then is still circumscribed by the

indenture, albeit less narrowly. The trustee is not required to act beyond his contractually conferred rights and powers, but must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation.

*Id.* That duty, although defined by reference to the indenture, is imposed by operation of New York common law. *See also AMBAC,* 151 Misc.2d at 340, 573 N.Y.S.2d at 208 ("After an event of default, [the indenture trustee] concedes, it would have fiduciary obligations.").

■ The fiduciary duty established in *Beck* is subject to two alternative interpretations. Read narrowly, that duty might require only that the trustee exercise the powers and duties enumerated in the indenture with the care of a prudent person. On that reading, First Fidelity could be held liable for breach of the common-law fiduciary duty only if the power to seek a lifting of the Eastern bankruptcy stay were specifically listed in the Indenture. That reading, however, would provide very limited protection to the investors, or would require the parties to anticipate every contingency at the time of contract formation. Either result would undermine the purpose of imposing an extra-contractual duty.

Read more broadly, *Beck* requires an indenture trustee to perform prudently even the more general obligations in the indenture, and applies to any conduct not specifically prohibited by the indenture which would enable the investors to secure repayment of the trust certificates. On that reading, the phrase "[t]he trustee is not required to act beyond his contractually conferred rights and powers" means that the trustee need not take action specifically prohibited by the contract, and that when the indenture imposes general duties on the trustee, the trustee must take any authorized action necessary to protect the investors. That reading is more faithful to the language of *Beck* and the purposes underlying the fiduciary duty. I note also that language of Real Property Law § 126, relied on and adopted by the First Department in formulating the New York common-law fiduciary duty in *Beck,* tracks the language of the fiduciary duty imposed by § 315(c) of the TIA, *supra* 1338, and imposes a duty of care under New York law that is congruent with the duty imposed by the TIA.

■ New York law on contribution and indenture trusts permits First Fidelity to seek contribution from Shawmut for an alleged breach of the common-law post-default fiduciary duty. The duty imposed by the Court in *Beck* applies directly to the facts presented here. Like the plaintiffs in *Beck,* plaintiffs here have alleged that the trustees breached their fiduciary duties by improperly exercising their powers under the Indenture after an event of default. The Second Amended Complaint states that:

> Under the Indenture and the Second Supplemental Indenture, upon the occurrence of an Event of Default, the Trust was entitled to recover from Eastern the aircraft Eastern had sold and leased back from the Trust, and to sell or lease those aircraft to third parties, and to use the proceeds of those sales and leases to pay the expenses of the Trust and to pay to the certificate holders the principal and accrued interest owed on their certificates.... the Trustees failed to take any steps to exercise this right until November 1990, by which time the value of the Trust's collateral had dramatically declined to an amount far less than the amount necessary to pay the principal claims of the certificate holders.

(SAC ¶ 21) Further, like the plaintiffs in *Beck,* plaintiffs here did not invest in a mortgage indenture trust that is governed by Real Property Law § 126. In the absence of that statutory protection, the common-law fiduciary duty controls. Because plaintiff alleges that First Fidelity has committed the tort of a breach of fiduciary duty, and because that tort exists under New York law, First Fidelity may seek contribution from joint tort-feasors.

Here, Shawmut qualifies as a joint tort-feasor from which First Fidelity may seek contribution because the two banks, if liable, have caused the "same injury" to plaintiff. Both banks served as indenture trustees dur-

ing the same period, from September 1, 1990 until the expiration of the trust. Arguably, the failure of both banks to apply to lift the bankruptcy stay before November 14, 1990 (the date on which the trustees moved to lift the stay), contributed equally to the further decline in the value of the collateral and reduced equally the investors' return. Accordingly, First Fidelity may implead Shawmut for contribution under N.Y.Civ.Prac.L. & R. § 1401 on the basis of plaintiffs' state law claim of breach of fiduciary duty. It bears emphasis, though, that the existence of a fiduciary duty does not mean that that duty has been breached by either First Fidelity or Shawmut. Those issues still must be proved at trial.

Contrary to First Fidelity's assertions, its ability to implead Shawmut under § 1401 does not derive from the standard of care contained in the TIA. First Fidelity argues that that statute creates a tort duty, and therefore, its claim for contribution under § 1401 is based in tort and is not barred by the prohibition on contribution for contract claims.

■■■ As discussed above, *supra* 1342–1346, there is no right to contribution under the TIA. It follows that there can be no right of contribution under New York law based on an alleged breach of the TIA. The source of a right of contribution under state law must be an obligation imposed by state law. If the underlying obligation is one imposed by federal law (such as the TIA), the contours of that obligation also are determined by federal law, *supra* 1340–1341 (explaining that federal law controls the right of contribution under a federal cause of action). Because federal law provides no right of contribution under the TIA, there likewise can be no right of contribution for violations of the TIA under state law.

## VI.

During the Eastern bankruptcy proceeding, a large group of certificate-holders reached a settlement with the trustees concerning the three Series' competing claims to the trust collateral. As part of that settlement, the trustees agreed to perform certain tasks, and the certificate-holders and trust-

ees agreed to release each other from certain future litigation. The Agreement states also that nothing contained therein

> shall be interpreted as a restriction on the right of a Trustee, notwithstanding the releases granted under the Plan, to take whatever action against anyone ... which it deems appropriate to defend itself (including, but not limited to, filing counter-claims, cross-claims and third-party complaints) in connection with any action in which it is named as a defendant.

(Settlement ¶ 9)

■■■ New York General Obligation Law § 15–108(b) provides that once an alleged tortfeasor is released from liability by plaintiff, that tortfeasor cannot be sued by a non-released joint tortfeasor for contribution. Similarly, a tortfeasor who has been released from liability may not seek contribution from any other person. *Id.* § 15–108(c). Parties to a settlement agreement may contractually waive the protections of § 15–108. *Mitchell v. New York Hospital,* 61 N.Y.2d 208, 216, 473 N.Y.S.2d 148, 152, 461 N.E.2d 285, 289 (1984); *National Enters. Corp. v. Dechert Price & Rhoads,* 181 A.D.2d 443, 444, 580 N.Y.S.2d 762, 762 (1st Dep't 1992).

■■■ Shawmut argues that § 15–108(b) and the release contained in the settlement agreement work to preclude First Fidelity's action here. I disagree. By carving out an exception for one trustee's third-party claims against another, the parties to the settlement agreement waived the protection of § 15–108. Any other reading of the agreement nullifies the explicit exception for counter-claims, cross-claims and third-party complaints necessary to a trustee's defense. Indeed, that exception, and its corresponding waiver of § 15–108(b), presumably were material terms of the release for First Fidelity; absent that provision, a settlement might not have been reached. Because Shawmut was a party to that settlement, and freely and knowingly agreed to the release and the exception, it has waived any protection it otherwise would have had under § 15–108. *See Monaghan v. SZS 33 Assocs., L.P.,* 73 F.3d 1276, 1282–83 (2d Cir.1996) (holding that settlement that permitted third-party action to

proceed "necessarily implied that [the third-party defendant] would waive its right to assert the statutory bar to [third-party plaintiff's] contribution claim."). The release, therefore, does not bar First Fidelity's present claim for contribution from Shawmut.

## VII.

First Fidelity contends that Gibson, Dunn is liable to it for contribution on the theory that Gibson, Dunn is liable to plaintiffs and to First Fidelity for attorney malpractice.

■ As a threshold matter, it is necessary to determine which state's law would apply to a claim of malpractice against Gibson, Dunn. Gibson, Dunn contends that New York law applies; First Fidelity presses for the application of New Jersey law. New York law permits claims for attorney malpractice when the relationship between the parties is one of "actual privity," or one that is "so close as to approach that of privity." *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 833, 605 N.E.2d 318, 320 (1992) (holding that a law firm that furnished to a third party an opinion letter containing false assurances could be liable to that third party for malpractice). The exception to the requirement of actual privity has been interpreted narrowly by the New York courts. *See, e.g., Aglira v. Julien & Schlesinger, P.C.,* 214 A.D.2d 178, 184, 631 N.Y.S.2d 816, 819 (1st Dep't 1995).

The New Jersey Supreme Court recently held that "attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to protection." *Petrillo v. Bachenberg,* 139 N.J. 472, 483–84, 655 A.2d 1354, 1359–60 (1995) (citing *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992), and others).[2] Central to both formulations is a foreseeability requirement, *i.e.,* the attorney was, or reasonably

should have been, aware of the third-party's reliance on the attorney's representations.

■ The choice here is governed by New York's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Those rules, referred to collectively as "interest analysis," give controlling effect to "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation." *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). In a tort case, the most important contacts are the parties' domiciles and the site of the alleged tort. *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 683–84 (1985).

■ Here, Gibson, Dunn is domiciled in New York, and First Fidelity in New Jersey. (TPC ¶¶ 1, 3) Gibson, Dunn's clients, Shawmut and NatWest, are domiciled in Connecticut and New Jersey, respectively. (TPC ¶ 2, SAC ¶ 5) Plaintiff LNC is domiciled in New York and Delaware, and plaintiff Charter is domiciled in Missouri. (SAC ¶¶ 1–2) The Trust was executed and delivered in New York, deemed a contract made in New York, and governed by New York law. (Indenture § 13.13) The locus of the tort of professional malpractice is somewhat less clear. First Fidelity alleges that Gibson, Dunn breached its professional obligation to First Fidelity and to plaintiffs by failing to advise any of the trustees to move promptly to lift the bankruptcy stay. That advice, if given, most likely would have been given in New York, where Gibson, Dunn is based, and where the Eastern bankruptcy proceeding was held. That advice might have been given in Connecticut, at Shawmut's headquarters, or in New Jersey at NatWest's or possibly First Fidelity's offices.

Interest analysis reveals that the interests of New York outweigh the interests of New Jersey, or of any other state here. A state has a strong interest in regulating the con-

---

**2.** The *Petrillo* rule will govern the plaintiffs' claims against Riker, Danzig and Clapp & Eisenberg. *LNC Investments, Inc. v. First Fidelity*

*Bank,* No. 92 Civ. 7584, 1994 WL 73648, *8 (S.D.N.Y. Mar. 3, 1994) (holding that New Jersey law governs those claims).

duct of a law firm licensed to practice within its borders, and a law firm consents to be so regulated when it locates its offices in a particular state. *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1994 WL 73648, *8 (S.D.N.Y. Mar. 3, 1994); *see also Shaklee Corp. v. Oberman*, No. 91 Civ. 6870, 1993 WL 378268 *1 (S.D.N.Y. Sept. 20, 1990) (holding that "New York has the predominant interest in issues involving legal malpractice allegedly committed by a New York attorney with respect to the performance of his duties in this state."). That principle exerts extra force here because New York, by adopting an attorney-protective strict privity rule, has articulated a strong interest in protecting its resident attorneys from suits by non-clients. Likewise, New York attorneys are entitled to rely on that protection when they practice law in New York. New Jersey has some interest in regulating out-of-state attorneys who enter that state, and in protecting its domiciliaries who participate in out-of-state transactions. But those interests do not outweigh New York's interests here.

■ Plaintiffs LNC and Charter National never were represented by Gibson, Dunn, and therefore never were in privity with Gibson, Dunn. Moreover, plaintiffs' relationship with Gibson, Dunn never approached privity. Gibson, Dunn never provided plaintiffs with a legal opinion, or any legal advice on which plaintiffs reasonably might have relied. In fact, Gibson, Dunn had no direct dealings with plaintiffs. *See also LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1994 WL 73648, *7 (S.D.N.Y. Mar. 3, 1994) ("If New York law is applied, plaintiffs fail to state a claim because they are not in privity with the defendant law firms and did not have a sufficiently close relationship with defendants."). Accordingly, First Fidelity's claim for contribution cannot be premised on plaintiffs' claim against Gibson, Dunn for malpractice, because plaintiffs have no such claim.

■ In the alternative, First Fidelity argues that because its own relationship with Gibson, Dunn was "as a member of a settled and particularized group of trustees who foreseeably acted and relied upon [Gibson, Dunn's] advice," it may maintain an action for contribution. (First Fidelity Rep.Mem. at 19) First Fidelity contends that its relationship with Gibson, Dunn resembled privity because it relied upon the advice of Gibson, Dunn's clients NatWest and Shawmut, and on the joint advice of the trustees' counsel, including Gibson, Dunn. (5/3/96 Taube Ltr. at 2)

But First Fidelity cannot squeeze its relationship with Gibson, Dunn into New York's narrow exception to the requirement of actual privity. That exception has been applied by the New York courts only when an attorney has furnished specific advice to a third party, when that advice was the "end and aim" of the transaction, when the attorney intended the third party to rely on that advice, and when the third party's reliance thereon was foreseeable. *Prudential*, 80 N.Y.2d at 385, 590 N.Y.S.2d at 835, 605 N.E.2d at 322. It makes sense to hold the attorney liable in such situations because the third party has entrusted its legal affairs to the attorney and reasonably has relied, to its detriment, on the attorney's professional expertise. It makes sense also to limit an attorney's malpractice liability to non-clients, because absent contractual privity or a relationship approaching privity, the "duty" element of a negligence claim is missing.

Here, Gibson, Dunn never furnished an opinion letter to First Fidelity on which First Fidelity reasonably and foreseeably relied. To the extent Gibson, Dunn supplied general advice to all the trustees, it did so only in its capacity as counsel to the Third Series Trustees. The other trustees, each of which was represented by its own attorney (First Fidelity was represented by Riker, Danzig at all relevant times) were free to accept or reject Gibson, Dunn's advice. Gibson, Dunn never explicitly assumed the role of counsel to all trustees, and First Fidelity does not assert any facts to suggest that Gibson, Dunn functionally took on that responsibility. Because neither plaintiffs nor First Fidelity was in actual or functional privity with Gibson, Dunn, neither could assert a claim of malpractice against Gibson, Dunn, and First Fidelity may not seek contribution from Gib-

son, Dunn on the basis of alleged malpractice.

## VIII.

■ Finally, First Fidelity asserts state common-law claims for indemnification against Shawmut and Gibson, Dunn. Unlike contribution, indemnification does not reallocate a portion of liability; rather, it shifts liability from one party to another. *Resolution Trust Corp. v. Young*, 925 F.Supp. 164, 169 (S.D.N.Y.1996). First Fidelity contends that Shawmut is liable to it for all of First Fidelity's potential liability to plaintiffs on theories of both express and implied indemnification, and that Gibson, Dunn is liable to it on a theory of implied indemnification.

■ First Fidelity builds its claim of express indemnification on Section 9.03(d) of the Indenture, which states that

> [First Fidelity] shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement, at the request, order or direction of any of the Series Trustees, pursuant to the provisions of this Agreement, unless Series Trustee shall have offered to [First Fidelity] reasonable security or indemnity against the costs, expenses and liabilities which might be incurred therein or thereby.

No plausible reading of that section yields express indemnification for the claims asserted against First Fidelity here. That section means only that if Shawmut, as Third Series Trustee, asked First Fidelity to exercise any of its designated powers under the Indenture, First Fidelity would not be obliged to exercise that power unless Shawmut indemnified First Fidelity for the costs of that action. Here, plaintiffs sue First Fidelity and several of the trustees not on the basis of an action requested by Shawmut, but on the basis of the trustees' inaction—*i.e.*, their failure to move promptly to lift the bankruptcy stay. Neither plaintiffs nor First Fidelity allege any facts to support a claim that Shawmut asked First Fidelity to act without properly providing advance payments. Accordingly, § 9.03 of the Indenture does not support First Fidelity's claim of express indemnification.

■ Implied indemnity is an equitable concept that works to shift liability when failure to do so would result in "the unjust enrichment of one party at the expense of another." *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 689–91, 555 N.Y.S.2d 669, 674–75, 554 N.E.2d 1257, 1262–63 (1990). Put differently, implied indemnification avoids the unfairness of holding one party liable solely on account of the negligence of another. *D'Ambrosio v. City of New York*, 55 N.Y.2d 454, 461, 450 N.Y.S.2d 149, 152, 435 N.E.2d 366, 368–69 (1982). For example, an employer may seek indemnification from its negligent employee, a building owner from a careless independent contractor, and an automobile owner from a negligent driver. *Id.* In contrast, a third-party claim for implied indemnification is not tenable when the plaintiff's claims against the third-party plaintiff are based upon the third-party plaintiff's own duties, acts or omissions. *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 24, 494 N.Y.S.2d 851, 853, 484 N.E.2d 1354, 1355–56 (1985).

■ First Fidelity argues that its potential liability should be shifted to Shawmut and Gibson, Dunn because under the Indenture it was powerless to act absent specific instructions from the Series Trustees. First Fidelity blames Shawmut for failing to provide such instructions, and blames Gibson, Dunn for failing to advise its client of the need for such instructions. (First Fidelity Rep.Mem. at 24–25; TPC ¶ 16) In support of its position that its potential liability is only "passive, technical, vicarious or imputed," First Fidelity relies on Sections 7.01, 7.02, 7.10 and 9.02 of the Indenture (although it does not point to specific language within those lengthy sections). Those sections, First Fidelity argues, establish a relationship between it and the Series Trustees akin to the one between an employer and its employee, a building owner and an independent contractor, or an automobile owner and a guest driver.

First Fidelity cannot escape its responsibility by this tortuous route. Several sections of the Indenture belie First Fidelity's

contention of mere passive liability. Section 7.02 of the Indenture states in relevant part:

> In the case of the happening and during the continuance of any Event of Default as provided in Section 7.01 hereof, the Collateral Trustee ... may, at its discretion, and shall, at the direction of the Series Trustee or Trustees representing one or more series which, in the aggregate, consist of a majority in the principal amount of the Secured Equipment' Certificates at the time Outstanding

demand that Eastern: (a) return the aircraft, (b) sell the aircraft, (c) hold, keep idle or lease the aircraft, (d) pay damages to the Collateral Trustee, or (e) "exercise any other right or remedy which may be available to it under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof." (Indenture § 7.02) That section authorized First Fidelity to act alone, when it saw fit, and required First Fidelity to act at the behest of the Series Trustee when so requested. That section did *not* disable First Fidelity from taking action to protect the investors absent instruction from a Series Trustee.

Further, Section 9.02 of the Indenture explains that in the event of default:

> [First Fidelity] shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.
>
> No provision of the Agreement shall be construed to relieve [First Fidelity] from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct....

Those provisions make clear that First Fidelity did have independent obligations under the agreement, and that First Fidelity could be held liable alone for its failure to discharge those obligations. Accordingly, First Fidelity's motion for implied indemnification must be denied.

## IX.

 Having considered the delay, prejudice and merits of First Fidelity's motion, I now must balance those factors to determine whether impleader is warranted. As discussed above, *supra* 1337, First Fidelity delayed inexcusably before moving to implead Shawmut. But, as also discussed above, *supra* 1348–1349, First Fidelity's motion to implead Shawmut has merit, at least at the pleading stage, under New York law. The merit of the action weighs heavily in the analysis, especially because Shawmut's alleged liability to First Fidelity parallels the alleged liability of First Fidelity, UJB, and NatWest to plaintiffs. As a consequence, the evidence put forth to prove those parties' breach of their state-law, post-default fiduciary duty, will be similar, and in part identical, to the evidence put forth to prove Shawmut's breach of that duty. Those similarities of proof make impleader substantially more efficient than the commencement of a second action. That Shawmut has participated in some discovery, as a result of NatWest's claim against it, reduces both the prejudice to Shawmut and delay of trial, and weighs also in favor of impleader. Accordingly, as to Shawmut, I find that the balance tilts in favor of impleader.

 With respect to Gibson, Dunn, all of the relevant factors weigh against impleader. Most importantly, First Fidelity fails to state a viable claim for contribution or indemnification against Gibson, Dunn. Moreover, First Fidelity delayed unreasonably and Gibson, Dunn has not participated in any discovery. The additional discovery and possible motions would unduly delay trial. Because impleader of Gibson, Dunn would result in substantial prejudice and negligible or no benefit, First Fidelity's motion to implead Gibson, Dunn would be denied even if the underlying claim had merit.

\*　　\*　　\*

For the reasons set forth above, First Fidelity may implead Shawmut only for contribution on plaintiff's state-law claim of breach

of fiduciary duty, and may not implead Gibson, Dunn.

SO ORDERED.